ANGLO-AMERICAN LAND, MORTGAGE & AGENCY CO., Limited, v. LOM-
BARD (two cases).

RAMSDEN v. CHESHIRE PROVIDENT INST.

SAME v. KEENE FIVE CENT SAV. BANK.

(Circuit Court of Appeals, Eighth Circuit.  July 16, 1904.)

Nos. 1858–1861.

1. CORPORATIONS—ACTION TO ENFORCE STATUTORY LIABILITY OF STOCKHOLDER
—NATURE.

The double liability imposed by the Constitution and statutes of Kansas
on stockholders of other than railway, charitable, and religious corpora-
tions is contractual in its nature, is to the creditors individually and not
to the corporations, and a right of action for its enforcement is legal, and
not equitable.

2. SAME—VOID OR FRAUDULENT TRANSFER OF STOCK NO OBSTACLE TO ENFORCE-
MENT OF STOCKHOLDERS' LIABILITY IN ACTION AT LAW.

A transfer of corporate stock, which is ultra vires of the transferee
or is fraudulent as to creditors, is not an obstacle to the enforcement of
the liability of the transferring stockholder in an action at law.

3. SAME—CONSTRUCTION OF PLEADING.

The fact that the petition, in an action by a creditor of a Kansas cor-
poration against a stockholder to enforce his statutory double liability,
charges that defendant and the other stockholders made a colorable trans-
fer of their stock to another corporation, for the purpose of escaping such
liability, which transaction is alleged to have been fraudulent as to cred-
itors, ultra vires of the transferee, and ineffectual to relieve defendant
of liability, does not make the action one in equity and not at law ; such
allegations not being made the basis for any equitable relief.

4. SAME—ACTION AT LAW IN FEDERAL COURT—EQUITABLE SET-OFF.

In an action at law in a federal court to enforce the constitutional and
statutory liability of a stockholder in a Kansas corporation to its creditors,
the defendant cannot set off an indebtedness from the corporation to him ;
such defense being only cognizable in equity, and the distinction between
legal and equitable causes of action and defenses being carefully pre-
served in courts of the United States.

5. ESTOPPEL IN PAIS—AVAILABILITY AS DEFENSE IN ACTION AT LAW.

An estoppel by matter in pais, sometimes called an equitable estoppel, is
available as a defense in an action at law.

6. FEDERAL COURTS—TRIAL TO COURT—SPECIAL FINDING.

A special finding by a Circuit Court in an action at law tried by stipula-
tion without a jury, to meet the requirements of Rev. St. §§ 649, 700 [U. S.
Comp. St. 1901, pp. 525, 570], must be the equivalent of a special verdict
of a jury.  It should cover all the issues, and state all the ultimate facts,
so that in the event of proceedings in error only questions of law will be
presented ; and if the trial court's conclusions of law are deemed incor-
rect, and if the proceedings are otherwise without error, the appellate court
may, under section 701, direct such judgment as the special finding re-
quires, without the necessity of awarding a new trial.  When such finding
is imperfect in that respect, responding to only a part of the issues, and
the facts found are not decisive of the case, the judgment must be re-
versed, and a new trial awarded.

7. CORPORATIONS—LIABILITY OF STOCKHOLDERS—RECEIPT OF STOCK DIVIDENDS.

Where a corporation, without a legitimate basis therefor, declares a
stock dividend, an implied promise on the part of stockholders receiving

¶ 7. Stockholders' liability to creditors in equity, see notes to Rickerson
Roller Mill Co. v. Farwell Foundry & M. Co., 23 C. C. A. 315 ; Scott v. Latimer,
33 C. C. A. 23.

132 F.—46

such additional stock to pay therefor arises only in favor of subsequent creditors of the corporation, who are presumed to have become such on the faith of the increased stock, and such liability cannot be enforced by a prior creditor.

8. SAME—DUTY TO EXERCISE POWERS AND CARRY ON BUSINESS THROUGH THEIR OWN OFFICERS AND EMPLOYÉS.

Where it is not otherwise provided, the implication in ·a grant of corporate power and life is that the corporation shall exercise its powers and carry on its business through its own officers and employés, and not indirectly through another corporation operated under its control, and that it shall maintain an independent corporate existence, and not surrender the control of its affairs or the exercise of its powers to another corporation.

9. SAME—POWERS—PURCHASE OF STOCK OF ANOTHER CORPORATION.

In the absence of express authority in its charter, a corporation has no power to acquire all the stock of another corporation for the purpose of controlling its affairs or exercising its powers through the use of its name, and such a purchase is ultra vires and void.

10. SAME—TRUST COMPANY—POWERS UNDER MISSOURI STATUTE.

The power given by Rev. St. Mo. 1889, § 2839, subd. 9, to trust companies organized thereunder, "to buy and sell all kinds of government, state, municipal and other bonds, and all kinds of negotiable and nonnegotiable paper, stocks and other investment securities," does not authorize such a corporation to purchase all the stock of another corporation for the purpose of controlling its management.

11. SAME—CONTRACT ULTRA VIRES.

A contract of a corporation which is ultra vires in a proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature, is not voidable only, but wholly void and of no legal effect, and it cannot be validated by estoppel.

12. SAME.

A transaction between two corporations which is ultra vires as to one is equally as invalid as though beyond the corporate powers of both.

13. SAME—STATUTORY LIABILITY OF STOCKHOLDERS—TRANSFER OF STOCK AND ASSETS OF CORPORATIONS.

A Kansas corporation, which was largely indebted on direct obligations, and also as guarantor of securities taken by it and transferred to others, transferred all of its assets to a Missouri corporation, which assumed its obligations, and its stockholders at the same time exchanged all of its stock for stock of the Missouri corporation. Held, that the transaction did not affect the liability of the stockholders of the Kansas corporation to its creditors, under the Constitution and statutes of the state, because the acquisition of the stock of the Kansas corporation was ultra vires of the Missouri corporation, and also because the transfer of the assets of the Kansas corporation operated as a legal fraud on its creditors, by depriving it of all power to pay its debts.

14. SAME—ESTOPPEL OF CREDITORS.

The fact that creditors of a corporation proved their claims in insolvency proceedings against a second corporation, which had obtained the assets and assumed the liabilities of the first, and received dividends thereon, did not estop them from enforcing the statutory liability of the stockholders of the first corporation for the balance remaining due them, nor from asserting the invalidity of the transfer of the stock to the second corporation as a part of the same transaction by which it assumed the indebtedness; the creditors never having released the first corporation, but having continued to assert its liability.

---

¶ 9. See Corporations, vol. 12, Cent. Dig. §§ 1532, 2322.

**15. ESTOPPEL—DEBTOR AND CREDITOR.**

A creditor who collects a portion of his claim from a third person, who after the debt is contracted agrees with the debtor to pay it, does not thereby discharge the debtor or become estopped from collecting the balance from a surety or guarantor.

**16. CORPORATION—ACTION AGAINST STOCKHOLDERS—LIMITATION.**

An action by a holder of securities on which an insolvent Kansas corporation was guarantor, to enforce the statutory liability of a stockholder, is not barred by limitation until the lapse of the prescribed period after the guaranties ripened into actual debts.

### On Petition for Rehearing.

**17. FEDERAL COURTS—TRIAL TO COURT—REVIEW**

Under Rev. St. §§ 649, 700 [U. S. Comp. St. 1901, pp. 525, 570], a written stipulation which clearly contemplates the trial to the court of an action at law and requests a special finding is a sufficient waiver of a jury to authorize a determination, upon writ of error, of the sufficiency of the facts found to support the judgment.

**18. CORPORATIONS—VALIDITY AND EFFECT OF CORPORATE ACTS IS QUESTION OF LOCAL LAW.**

Each state may determine what powers shall be possessed by corporations organized under its authority and what effect shall attach to acts done by such corporations beyond their powers. The question is one of state policy, and therefore a matter of local and not general law.

**19. FEDERAL COURTS—CONCLUSIVE EFFECT OF DECISIONS OF STATE COURTS UPON QUESTIONS OF LOCAL LAW.**

A fixed and settled rule of decision in a state court of last resort establishes the law of the state in such manner as to bind the federal courts in all matters controlled by the state law; but the opinions of intermediate appellate courts, while entitled to great respect and regarded as persuasive authority, are not controlling upon the federal courts, because they do not settle the law of the state.

**20. CORPORATIONS—IN MISSOURI CONTRACTS WHICH ARE ULTRA VIRES ARE NOT RENDERED ENFORCEABLE BY PARTIAL PERFORMANCE—NO ESTOPPEL.**

Upon the question whether a contract of a corporation which is not within the scope of its corporate powers, and is therefore prohibited, can have or be given the effect of placing upon the corporation an enforceable executory obligation, the decisions of the Supreme Court of Missouri are considered and held to establish the rule that, where the contract has been fully performed on both sides, what has been done will not be undone at the suit of either party, but where any part of the contract remains executory its invalidity may be effectually asserted, notwithstanding its partial performance, because the power to enter into the contract or to make it obligatory at all has been withheld by the authority which created the corporation and defined its powers.

**21. PLEADING—OBJECTION RAISED FOR FIRST TIME IN APPELLATE COURT.**

An objection that the petition in an action to enforce the liability of a stockholder is indefinite, in that it does not disclose whether the corporate obligations upon which the action is founded were unconditional or were guaranties, and therefore conditional, cannot be raised in an appellate court, where no objection was taken in the trial court and the record discloses that there was no purpose in that court to make any point upon the indefinite statement in the pleading.

**22. VENUE—CAUSE OF ACTION—PLACE WHERE IT ARISES.**

The place where a cause of action arises is determined by inquiring, not where it may be enforced, but where the act or breach occurs which gives the cause of complaint and creates the necessity for bringing an action.

**23. SAME—RIGHT OF ACTION AGAINST STOCKHOLDER.**

The cause or right of action given by the Constitution and laws of Kansas to a creditor against a stockholder, where a corporation of that

state suspends business for more than one year without paying its debts, arises in that state, and not in the state of the stockholder's residence, because it is created by the Constitution and laws of Kansas operating upon conditions and occurrences within that state.

In Error to the Circuit Court of the United States for the District of Kansas.

These were actions at law prosecuted by plaintiffs in error, as creditors of the Lombard Investment Company, a Kansas corporation (called herein the "Kansas Company"), against defendants in error, as stockholders of that company, to enforce the additional or double liability imposed by the Constitution and statutes of Kansas upon stockholders in corporations organized under the laws of that state, and to enforce a claimed unpaid subscription to additional stock issued by the corporation.

The petitions allege, in effect, that all of the assets and property of the Kansas Company were placed in the possession of a receiver or receivers appointed in a creditors' suit commenced September 18, 1893, against that company and the Missouri Company, hereinafter mentioned, in the Circuit Court of the United States for the Western District of Missouri; that the bill in the creditors' suit prayed, in addition to the appointment of a receiver, an adjudication of the claims against the Kansas Company, a sale of its property, and the application of the proceeds upon the claims allowed; that the Anglo-American Company and the assignors of Ramsden intervened in the suit, and procured an adjudication of their claims against the Kansas Company; that the assets and property of the company were sold, and the proceeds distributed among the creditors, pursuant to a final decree entered May 22, 1895, in which the company was adjudged to have been insolvent at and subsequent to the time of the filing of the bill; that the orders and decree in the suit in the Western District of Missouri were confirmed by like proceedings in an ancillary suit in the Circuit Court of the United States for the District of Kansas; that since said proceedings and sale the company has been wholly without any assets or property of any kind; that about August 1, 1890, the company, with its officers, permanently left the state of Kansas, and removed its offices therefrom; that at the same time the stockholders of the Kansas Company transferred the entire stock of that company, amounting to $1,875,000, to the Lombard Investment Company of Missouri, a newly organized Missouri corporation (called herein the "Missouri Company"), in exchange for a like amount of the stock of the latter company, the total of which was $4,000,000; that this transfer and exchange were merely colorable, and made for the purpose of escaping the liability imposed upon stockholders by the Constitution and laws of the state of Kansas; that the transfer and exchange were therefore void, and in nowise relieved the stockholders of the Kansas Company from such liability; that defendants were at all of these times, and are now, stockholders of the Kansas Company; that plaintiffs are severally creditors of the Kansas Company upon claims allowed and adjudicated in the creditors' suit, as before stated; and that the amounts claimed by plaintiffs are due to them, respectively, after deducting the distributive shares or dividends received through the sale made under the decree in the creditors' suit. The prayer in each case is for a money judgment.

In addition to a set-off pleaded in two cases, three defenses presented by the answers are insisted upon: (1) The relief sought by plaintiffs is equitable in character, and cannot be had in actions at law. (2) The Anglo-American Company and the assignors of Ramsden accepted the benefits of the transaction of which the transfer of stock was part, and, with full knowledge of all the facts, acquiesced in, consented to, and affirmed, the transfer. In connection with this defense, the answers allege: "The Missouri Company bought and acquired all the stock of the Kansas Company and its entire assets and interests of every kind, nature, and description, and assumed all of its liabilities, with the same force and effect as if it had originally on its part created the obligation, and each and every creditor of the Kansas Company, including the then owner of the debt sought to be enforced in this action, agreed thereto, and consented to substitute the Missouri Company as the debtor in lieu of the Kan-

sas Company, and to discharge and release the latter from any obligation upon its part. * * * In substance, the transaction of 1890 took the form of the stockholders in the Kansas Company, who made the exchange, subscribing for stock in the Missouri Company, and paying therefor by a transfer of their stock in the Kansas Company. For all the stock in the Missouri Company in excess of the amount of the capital stock of the Kansas Company the subscribers paid a premium in cash in an amount exceeding the face value of the stock, aggregating about $2,200,000, all of which was paid into the treasury of the Missouri Company upon the faith of carrying out the plan hereinbefore stated, succeeding to the business of the Kansas Company, and having the owners of the stock of the Kansas Company transfer their stock to the Missouri Company. As a part of the consideration for the transfers hereinbefore set out, and for the subscription for the $4,000,000 of stock to the Missouri Company by several hundred investors, the Missouri Company agreed in writing to save the Kansas Company and all its stockholders harmless from any and all liability, no matter how arising, growing out of the business of the Kansas Company. This arrangement was consummated August 1, 1890, at which time the Kansas Company ceased to do business, being then superseded and succeeded by the Missouri Company, which from that date until the appointment of receivers, as hereinafter mentioned, transacted all the business theretofore carried on by the Kansas Company, and performed all of its obligations, met all of its liabilities, and succeeded to and enforced all of its rights; but the organization of the Kansas Company was kept alive for the purpose of aiding, if desired, the Missouri Company in its business by the execution of numerous deeds and transfers, as from time to time became necessary, but said Kansas Company did no business, and performed none of its obligations. * * * The receivers voted, controlled, and acted as owners of the stock of the Kansas Company, including the shares transferred by the defendant herein to the Missouri Company. The receivers officered the Kansas Company, and required these officers to join in the execution of deeds and conveyances, making title, and creating assets to be distributed in said proceedings." (3) The claims are barred by the statute of limitations. In their replies to these answers, plaintiffs fully put in issue the allegation that they agreed to the transfer, and consented to substitute the Missouri Company as the debtor in lieu of the Kansas Company, and to discharge and release the latter from any obligation upon its part. The replies also contain these allegations: "That the business of the Kansas Company was thereby transferred from the state of Kansas to the state of Missouri, and carried on by the same officers and in the same manner, pursuing the same course of business and the same character of business as had been theretofore pursued by the Kansas Company; the said Missouri Company representing and acting for and in behalf of the said Kansas Company in respect to all of its previous business, carrying the same on and continuing it without break or change in any manner or respect whatsoever. * * * That in making the said change of said corporation from the state of Kansas to the state of Missouri, the said Lombard Investment Company did not provide for the payment of the debts and obligations of the Kansas Company in any respect whatsoever, except the assumption of the indebtedness of the Kansas Company by the Missouri Company. * * * That the alleged transfer of all the assets and property of the Lombard Investment Company of Kansas to the Lombard Investment Company of Missouri, the exchange of the capital stock of the Kansas Company for stock of the Missouri Company, the alleged purchase of all of the stock of the Kansas Company by the Missouri Company, were carried on and conducted by the officers and directors and others interested in the Kansas Company. That said transfers and transactions upon the part of the said Kansas Company, as well as upon the part of the said Missouri Company, were without authority conferred upon said corporations by the laws of the states of Missouri and Kansas, respectively, * * * and each and all of said acts were ultra vires of said corporations and of each of them, and were wholly null and void. * * * Replying * * * particularly with reference to the bar of the statute of limitations of the state of Kansas, the plaintiff avers that at all times during the said transactions the said defendant was a nonresident of, and absent from, the state of Kansas."

It was stipulated in the cases against James L. Lombard and B. Lombard, Jr., that plaintiff's recovery, if any, should be $15,000, with interest, in each case; that the statute of limitations of Missouri should apply in the case against James L. Lombard, and that of Massachusetts in the case against B. Lombard, Jr., these being the states of their residence, and their submission to the jurisdiction of the court below being voluntary; and that the action against the former should be deemed to have been commenced July 18, 1898, and the action against the latter May 27, 1898. The cases were tried together to the court, the parties having filed written stipulations waiving a jury. There was no general finding. Counsel prepared what was deemed by them to be a special finding, which was adopted by the court, and judgment for defendant was given thereon in each case. Plaintiffs seek to reverse these judgments. From the special finding, we extract the following: The Kansas Company was incorporated under the laws of Kansas in 1882, for the purpose of loaning money, guarantying the collection of the principal and prompt payment of the interest on loans, etc., and was not a railway, charitable, or religious corporation. August 1, 1890, its capital stock was $1,875,000, in shares of $100 each. Of these, James L. Lombard was the owner of 2812½ shares, B. Lombard, Jr., 2812½ shares, Cheshire Provident Institution 94½ shares, and Keene Five Cent Savings Bank 178½ shares. The Anglo-American Company holds the notes of third persons, the payment of which was guarantied by the Kansas Company, upon which there is due and unpaid much more than $30,000, with interest. Ramsden holds debentures of the Kansas Company and notes of third persons, the payment of the latter being guarantied by that company, upon which there is due and unpaid an amount in excess of the aggregate additional or double liability upon the stock of the Kansas Company owned by the Cheshire Provident Institution and the Keene Five Cent Savings Bank. All of these obligations of the Kansas Company were contracted and outstanding prior to August 1, 1890. Treating its capital stock as a liability, that company then possessed assets just equaling its liabilities, other than its obligation on outstanding guaranties, which exceeded $43,000,000 in amount. About that time the Kansas Company caused the organization of the Missouri Company, with a capital stock of $4,000,000, under the laws of Missouri, which do not impose an additional or double liability upon stockholders, and thereupon the Kansas Company transferred all of its assets and property of every character to the Missouri Company; the latter agreeing "to save the Kansas Company and all of its stockholders harmless from any and all liability on all claims, debts, and demands, ho matter how arising, growing out of the said Kansas Company's business since its incorporation," and "to pay all claims now existing or hereafter arising against said Kansas Company, or any of its stockholders." As part of this transaction, the stockholders in the Kansas Company surrendered to the Missouri Company their stock in the Kansas Company, and received in exchange a like amount of stock in the Missouri Company. The transfer of the assets and property of the Kansas Company and the surrender of the stock held by its stockholders were made pursuant to a vote of its stockholders declaring "that it is to the interest of this company to wind up its affairs, and reorganize with larger capital stock under the laws of Missouri," and containing this direction: "That the officers and directors of this company be, and they are hereby, empowered and instructed to wind up the affairs of this company, and dispose of all the assets thereof to the Lombard Investment Company (of Missouri), and they are further instructed to distribute the proceeds arising from the disposition of the assets pro rata among the stockholders of this company." Preparatory to this authorization by the stockholders of the Kansas Company, each of the defendants and other stockholders had executed a subscription to the stock of the Missouri Company in the amount of his stock in the Kansas Company, to be paid by an exchange of such shares. This subscription also designated an attorney in fact to act for the subscriber at all meetings of the stockholders of the Kansas Company, "for the purpose of effecting the exchange, surrender, and cancellation of said stock, and for the purpose of closing up the business or transferring the same to the Lombard Investment Company (of Missouri), and to receive all my shares of stock to be issued to me by the Lombard Investment Company (of Missouri)." The assets and stock of the Kansas Company were purchased by the Missouri Com-

pany, pursuant to a vote of its stockholders, declaring: "It is to the interest of this company to obtain all of the outstanding shares of the Lombard Investment Company, Kansas." After the transfer, the Kansas Company ceased to do business, and was superseded and succeeded by the Missouri Company. The latter then carried on the same business in the same manner as it had been previously conducted by the Kansas Company, took care of the Kansas Company's liabilities as far as it could, placed its own employés in the corporate offices of the Kansas Company, and nominally kept it alive for the sole purpose of controlling it in the matter of making and perfecting titles, executing releases and like instruments pertaining to the business transferred. Independent corporate existence of the Kansas Company ceased after the transfer. The purpose in the transfer was to accomplish an increase in the capital stock, and to avoid the additional or double liability imposed upon stockholders by the Constitution and statutes of Kansas, as investors objected to taking stock in a corporation formed under the laws of a state imposing an additional or double liability. In fact the transfer was made without fraud and in good faith; the parties thereto believing the Missouri Company would be able to meet the obligations of the Kansas Company as they matured. The stock of the Missouri Company not required to make the exchange for stock in the Kansas Company was disposed of for cash, which was invested in the corporate business. In 1893 both companies were insolvent, and through the creditors' suits, primary and ancillary, before named, their entire assets and property were placed in the possession of a receiver or receivers as a common fund, and sold, and the proceeds distributed ratably among the creditors. In the creditors' suits the Anglo-American Company and the assignors of Ramsden presented the claims now under consideration, and made proof thereon against both companies, and the claims were allowed by the master and by the court, but the orders of allowance do not in terms make the allowance against both companies, or confine it to either of them. To obtain the largest value from the assets to be sold under the decrees in the creditors' suits, the creditors of the two companies organized a new corporation, which, through a committee, purchased the assets of the two companies at the sale, and to this new corporation the creditors, including the Anglo-American Company and the assignors of Ramsden, transferred their claims against the general assets then in the hands of the receiver or receivers and about to be sold, but retained the right to resort to any special security for the payment of their demands. This was known as the "Flower Plan," and through it the creditors, including the Anglo-American Company and the assignors of Ramsden, accepted stock in the new corporation as their distributive share of the general assets sold, instead of insisting upon a cash dividend. The amounts claimed in the present actions are balances due upon the claims so allowed and so sharing in the distribution. The Missouri Company was organized under the statute of Missouri relating to trust companies (chapter 42, art. 11, Rev. St. 1889), and its purposes included all of those named in section 2389, one of which is this: "Ninth. To buy and sell all kinds of government, state, municipal, and other bonds, and all kinds of negotiable and non-negotiable paper, stocks and other investment securities." After the transfer the Anglo-American Company and Ramsden's assignors treated and dealt with the Missouri Company as having succeeded to the business of the Kansas Company, and as having agreed to discharge its debts and liabilities; but they did not at any time release the Kansas Company, or any of its stockholders, from the payment of these debts or liabilities, unless such release is to be implied as a matter of law from the facts stated. The Cheshire Provident Institution and the Keene Five Cent Savings Bank are New Hampshire corporations, and neither has had an agency in the state of Kansas. The finding contains no statement of the terms of the specific guaranties of the Kansas Company upon which in part plaintiffs' actions are founded, or of the terms of the principal obligations, payment of which was so guarantied, or of the time when the conditional liability of the Kansas Company upon these guaranties ripened into actual debts of that company. Upon these facts the circuit court's conclusion was that the Anglo-American Company and Ramsden's assignors, each with full knowledge of all the facts, acquiesced in, consented to, and affirmed the transfer of the Kansas Company's stock, and that in consequence plaintiffs are estopped from asserting any invalidity in the transfer

or any present liability on the part of defendants as stockholders in the Kansas Company.

The Constitution of Kansas provides, in section 2 of article 12, as follows: "Dues from corporations shall be secured by individual liability of the stockholders to an additional amount equal to the stock owned by each stockholder, and such other means as shall be provided by law; but such individual liabilities shall not apply to railroad corporations, nor corporations for religious or charitable purposes." The General Statutes of 1868 of that state (chapter 23) contain these provisions:

"Sec. 40 (as amended in 1883.) Laws 1883, p. 88, c. 46. A corporation is dissolved—first, by the expiration of the time limited in its charter; second, by a judgment of dissolution rendered by a court of competent jurisdiction; but any such corporation shall be deemed to be dissolved for the purpose of enabling any creditors of such corporation to prosecute suits against the stockholders thereof to enforce their individual liability, if it be shown that such corporation has suspended business for more than one year, or that any corporation now so suspended from business shall for three months after the passage of this act fail to resume its usual and ordinary business." Section 45, p. 700, Gen. St. 1897.

"Sec. 44. If any corporation, created under this or any general statute of this state, except railway or charitable or religious corporations, be dissolved, leaving debts unpaid, suits may be brought against any person or persons who were stockholders at the time of such dissolution, without joining the corporation in such suit; and if judgment be rendered, and execution satisfied, the defendant or defendants may sue all who were stockholders at the time of dissolution, for the recovery of the portion of such debt for which they were liable, and the execution upon the judgment shall direct the collection to be made from property of each stockholder, respectively; and if any number of stockholders (defendants in the case) shall not have property enough to satisfy his or their portion of the execution, then the amount of deficiency shall be divided equally among all the remaining stockholders, and collections made accordingly, deducting from the amount a sum in proportion to the amount of stock owned by the plaintiff at the time the company dissolved." Section 49, p. 701, Gen. St. 1897.

"Sec. 32. If any execution shall have been issued against the property or effects of a corporation, except a railway or a religious or charitable corporation, and there cannot be found any property whereon to levy such execution, then execution may be issued against any of the stockholders, to an extent equal in amount to the amount of stock by him or her owned, together with any amount unpaid thereon; but no execution shall issue against any stockholder, except upon an order of the court in which the action, suit or other proceeding shall have been brought or instituted, made upon motion in open court, after reasonable notice in writing to the person or persons sought to be charged; and, upon such motion, such court may order execution to issue accordingly; or the plaintiff in the execution may proceed by action to charge the stockholders with the amount of his judgment." Section 50, p. 702, Gen. St. 1897.

John A. Eaton (J. McD. Trimble and C. A. Braley, on the brief), for plaintiffs in error.

Frank Hagerman (Thomas B. Wall, on the brief), for defendants in error.

Before SANBORN, THAYER, and VAN DEVANTER, Circuit Judges.

VAN DEVANTER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

As the principal object of these actions is to enforce the additional or double liability imposed upon stockholders in corporations organized under the laws of the state of Kansas, a statement of the

nature of this liability and of the rights of corporate creditors in its enforcement, as established by judicial decisions, will assist in the consideration of the questions presented.

The constitutional and statutory provisions in Kansas, before quoted, are to be taken together as making one body of law, and as casting a certain definite liability upon each stockholder in other than railway, charitable, and religious corporations. This liability covers all contractual obligations of the corporation—whether it includes liabilities for torts, either before or after judgment, being undetermined—and is to an amount equal to the par value of the stock owned by the stockholder. Though statutory in origin, the liability is contractual in nature. It is several, and is to the creditors individually, and not to the corporation. Such is the decision of the Supreme Court of the United States in Whitman v. Oxford National Bank, 176 U. S. 559, 20 Sup. Ct. 477, 44 L. Ed. 587, and it is also the effect of the decisions of the Supreme Court of Kansas. Howell v. Manglesdorf, 33 Kan. 194, 5 Pac. 759; Abbey v. Dry Goods Company, 44 Kan. 418, 24 Pac. 426; Pierce v. Security Company, 60 Kan. 164, 55 Pac. 853; Woodworth v. Bowles, 61 Kan. 569, 60 Pac. 331. The decisions of the Supreme Court of the state also determine that the liability of the stockholder includes unmatured and contingent obligations of the corporation, as well as those which are matured and absolute (Cottrell v. Manlove, 58 Kan. 405, 408, 49 Pac. 519; Brigham v. Nathan, 62 Kan. 243, 249, 62 Pac. 319; McHale v. Moore, 66 Kan. 267, 71 Pac. 522; Crissey v. Morrill, 60 C. C. A. 460, 125 Fed. 878); that two distinct remedies are provided by sections 32 and 44, one relating to the exigency of corporate insolvency irrespective of dissolution, and the other relating to the exigency of corporate dissolution irrespective of insolvency; that the remedy against the stockholder under section 44 is available to the creditor immediately upon the dissolution, without first recovering a judgment against the corporation (Cottrell v. Manlove, supra; Sleeper v. Norris, 59 Kan. 555, 559, 53 Pac. 757; Brigham v. Nathan, supra); that where for more than one year the usual and ordinary business which constitutes the active life of the corporation is suspended, and the business transacted is only such as looks to a cessation of the corporate affairs, dissolution is conclusively presumed for the purpose of enabling the creditor to enforce the stockholders' liability (Brigham v. Nathan, supra); that this is so without any separate or precedent judicial determination of the dissolution (First National Bank v. King, 60 Kan. 733, 57 Pac. 952); that such suspension of business operates as a dissolution only for the purpose named, and does not prevent an action against the corporation and the recovery of judgment against it (Sleeper v. Norris, supra; Whitman v. Citizens' Bank, 49 C. C. A. 122, 110 Fed. 503); and that a judgment against the corporation is binding upon the stockholders as an adjudication of the liability of the corporation (Howell v. Manglesdorf, 33 Kan. 194, 197, 5 Pac. 759; Hancock National Bank v. Farnum, 176 U. S. 640, 20 Sup. Ct. 506, 44 L. Ed. 619). It is further held by the Supreme Court of Kansas that under the statute of limitations of the state (subdivi-

sion 2, sec. 12, c. 95, Gen. St. 1897), the period of limitation for commencing proceedings to enforce the stockholder's liability is three years (Cottrell v. Manlove, supra; First National Bank v. King, supra; Fox v. Bank, 9 Kan. App. 18, 21, 57 Pac. 241); that where there is a dissolution this period begins to run as soon as there is a right of action under section 44, and cannot be prolonged or extended by adopting the slower process of obtaining judgment against the corporation, and then enforcing it against the stockholder, under section 32, by motion for execution against him, or by action to charge him with the amount of the judgment (Cottrell v. Manlove, supra); that the right of action which arises in favor of the creditor and against the stockholder immediately upon dissolution extends to all unpaid debts of the corporation, whether matured or unmatured (Brigham v. Nathan, supra); that in respect of a contingent liability, such as upon a guaranty of the payment of an unmatured note or obligation of a third person, the right of action does not arise until the liability ripens into an actual debt of the corporation (McHale v. Moore, 66 Kan. 267, 71 Pac. 522; Cottrell v. Manlove, supra; Crissey v. Morrill, supra); and that the creditor's right to enforce the stockholder's liability and the running of the statute of limitations are not postponed or affected because property of the corporation may be in the possession of a receiver or assignee which may ultimately be available for the payment of debts (Sleeper v. Norris, supra).

The rights asserted and the relief sought by plaintiffs in these cases are legal and not equitable. The purpose is to enforce a contractual liability for the payment of money, and not to follow or reach property fraudulently conveyed. The contention that the relief sought can be had only in equity is rested upon an assumption that part of that relief consists in setting aside the transfer to the Missouri Company of defendants' stock in the Kansas Company. The assumption does not arise from a correct interpretation of the petitions. They allege that the entire stock of the Kansas Company was transferred to the Missouri Company in exchange for stock in the latter company; that the transfer was merely colorable, and made for the purpose of escaping the liability imposed upon stockholders by the Constitution and laws of the state of Kansas; that the transfer was void, and in no wise relieved the defendants from their liability as stockholders in the Kansas Company; and that defendants were at all the times named, and are now, stockholders in that company. The petitions do not treat the transfer as an obstacle to a recovery by plaintiffs, and they do not ask that it be set aside. The right of recovery asserted does not flow from the transfer, and is not dependent upon it. If the transfer was ultra vires, it was a nullity, and if it was made to escape liability for existing corporate debts and obligations, and was fraudulent in fact or in law, it is not an obstacle to the enforcement of that liability in an action at law. Lamson v. Hutchings, 55 C. C. A. 245, 118 Fed. 321, and authorities cited. Properly speaking, the transfer was matter of defense, and not part of plaintiffs' cause of action; but if it were otherwise, we think the petitions, although

somewhat indefinite, are sufficient to present the question of the character of the transfer, and are not inconsistent with the more specific claims of fraud in law and ultra vires set forth in the replies, to the presentation of which in that manner no objection was taken.

In the case against the Cheshire Provident Institution the defendant by its answer sought to set off against plaintiff's demand an indebtedness owing to defendant by the Kansas Company upon debenture bonds issued by that company, and upon its guaranty of the payment of bonds and notes executed by others. To so much of the answer as presented the set-off a demurrer was interposed, on the ground that it could be entertained and allowed only in a court of equity. The overruling of the demurrer is assigned as error. At common law, mutual cross-demands not connected with each other, or arising out of the same transaction, could not be set off one against the other. To accomplish this it was necessary to resort to a court of equity. The allowance of the set-off here asserted is more dependent upon principles applied only in suits in equity than would be the allowance of an independent cross-demand against plaintiff. The demand which defendant interposes is not an obligation or debt of plaintiff, but of the Kansas Company, and no action at law could be maintained thereon against plaintiff. Defendant's additional or double liability as a stockholder is not to the Kansas Company, but to its creditors, and no action to enforce the liability could be maintained by the company. Abbey v. Dry Goods Company, 44 Kan. 415, 24 Pac. 426; Evans v. Nellis, 187 U. S. 271, 277, 23 Sup. Ct. 74, 47 L. Ed. 173. In Kansas a Code of Procedure has been adopted which abolishes the distinction between actions at law and suits in equity, and which specifically permits a defendant to present in any civil action as many defenses, counterclaims, set-offs, and rights to relief as he may have, whether they be such as have been heretofore denominated legal or equitable, or both. Gen. St. 1897, c. 95, §§ 6, 94. Under this legislation it is the practice in the courts of Kansas to permit stockholders in actions like this to avail themselves of any equitable set-off which they may have, in like manner as they may interpose a defense available at common law. Pierce v. Security Company, 60 Kan. 164, 55 Pac. 853; Van Pelt v. Strickland, 60 Kan. 584, 57 Pac. 498; Abbey v. Long, 44 Kan. 688, 24 Pac. 1111; Musgrave v. Glen Elder Association, 5 Kan. App. 393, 49 Pac. 338; Campbell v. Reese, 8 Kan. App. 518, 56 Pac. 543. But in the courts of the United States the distinction between actions at law and suits in equity and between legal and equitable defenses is carefully preserved, because it is clearly recognized in the Constitution and laws of the United States. It follows that in the federal courts state legislation cannot have the effect of confounding the principles of law and equity, or of authorizing the blending together in one suit of legal and equitable claims, or of permitting equitable defenses in actions at law. Bagnell v. Broderick, 13 Pet. 436, 10 L. Ed. 235; Bennett v. Butterworth, 11 How. 669, 13 L. Ed. 859; Thompson v. Railroad Company, 6 Wall. 134, 18 L. Ed. 765; Foster v. Mora, 98 U. S. 425, 25 L. Ed. 191; Northern Pacific Railroad v. Paine, 119 U. S. 561,

7 Sup. Ct. 323, 30 L. Ed. 513; Scott v. Neeley, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358; Scott v. Armstrong, 146 U. S. 499, 512, 13 Sup. Ct. 148, 36 L. Ed. 1059; Lindsay v. First Nat. Bank, 156 U. S. 485, 493, 15 Sup. Ct. 472, 39 L. Ed. 505; Davis v. Davis, 18 C. C. A. 438, 72 Fed. 81; Schoolfield v. Rhodes, 27 C. C. A. 95, 82 Fed. 153; Highland Boy Gold Mining Co. v. Strickley, 54 C. C. A. 186, 116 Fed. 852; Crissey v. Morrill, 60 C. C. A. 460, 125 Fed. 878, 886; Platt v. Larter (C. C.) 94 Fed. 610. In Highland Boy Gold Mining Co. v. Strickley, supra, the subject was fully covered by this court in this way:

"The difference between causes of action at law and in equity is matter of substance, and not of form. In the national courts the ineradicable distinction between them is as sedulously preserved in the forms and practice available for their maintenance as it is in the natures of the causes themselves and in the principles upon which they rest. A legal cause of action may not be sustained in equity, because there is an adequate remedy for the wrong it presents at law, and it is only when there is no such remedy that a suit in equity can be maintained. Equitable causes and defenses are not available in actions at law, because they invoke the judgment and appeal to the conscience of the chancellor, and the free exercise of that judgment and conscience is forbidden in actions at law by the rule which entitles either party to a trial of all the issues of fact by a jury. In the federal courts an action at law cannot be maintained in equity, nor is an equitable cause of action or an equitable defense available at law."

Crissey v. Morrill, supra, presented the identical question now under consideration, and in concluding its discussion we said:

"We are of opinion, therefore, that the set-offs in favor of the defendants below, which the finding of the lower court tends to establish, and, as we think, does establish, were not admissible as a defense in favor of the respective defendants; the same being set-offs of an equitable character, and this being an action at law. To avail themselves of these set-offs, the defendants must seek the aid of a court of equity. A court of equity undoubtedly possesses adequate power to render them effective by ascertaining the amount of the respective set-offs, and decreeing that they be deducted from the liability of the respective stockholders, and that the plaintiff in this proceeding only recover such balance, if any, as may remain after the set-offs are discharged."

In Scott v. Armstrong, supra, the Circuit Court of Appeals for the Sixth Circuit had propounded to the Supreme Court the direct question whether a Circuit Court of the United States sitting in Ohio had jurisdiction in an action at law to entertain and allow an equitable set-off. After considering the effect of the Ohio Code of Procedure, which is identical with that of Kansas, and after considering the conformity act of Congress (section 914, Rev. St. [U. S. Comp. St. 1901, p. 684]), the Supreme Court answered in the negative, saying:

"The jurisprudence of the United States has always recognized the distinction between law and equity as under the Constitution matter of substance, as well as of form and procedure, and, accordingly, legal and equitable claims cannot be blended together in one suit in the Circuit Courts of the United States, nor are equitable defenses permitted [at law]. * * * We are of opinion that the Circuit Court had no power to grant the set-off in question in the suit at law." 146 U. S. 512, 13 Sup. Ct. 148, 36 L. Ed. 1059.

We have given attentive consideration to the cases which are claimed to announce a contrary rule (Partridge v. Insurance Co., 15 Wall. 573, 579. 21 L. Ed. 229; Dushane v. Benedict, 120 U. S.

630, 7 Sup. Ct. 696, 30 L. Ed. 810; Auten v. Bank, 174 U. S. 125, 148, 19 Sup. Ct. 628, 43 L. Ed. 920; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 552, 22 Sup. Ct. 431, 46 L. Ed. 679; Charnley v. Sibley, 20 C. C. A. 157, 73 Fed. 980; Fidelity, etc., Co. v. Bank, 38 C. C. A. 193, 97 Fed. 297, 56 L. R. A. 228); but the controlling propriety of adhering to decisions of the Supreme Court and of this court which are directly in point compels us to again hold that it is not permissible to interpose an equitable set-off as a defense to an action at law in a Circuit Court of the United States. The demurrer to so much of the answer as presented the set-off should have been sustained, without prejudice to the right of defendant to resort to a suit in equity to establish the set-off and make it effective.

A like set-off was pleaded and demurred to in the case against the Keene Five Cent Savings Bank, and the same ruling should have been made in that case.

Plaintiffs also contend that the Circuit Court failed to regard the distinction between law and equity, by giving effect to a defense of equitable estoppel in these actions at law. Estoppels by matter in pais, as distinguished from estoppels by record or deed, are sometimes called equitable estoppels, because they originated in courts of equity. But it is not meant by this that they are not available in courts of law, or are cognizable only in courts of equity. Such estoppels were early recognized in courts of law, and came to be so readily and freely sustained as matter of defense at law that it is neither necessary nor permissible to resort to equity for the mere purpose of obtaining the benefit of such an estoppel, when there is not otherwise a ground of equitable jurisdiction. Barnard v. German-American Seminary, 49 Mich. 444, 13 N. W. 811; Vermont Copper Mining Co. v. Ormsby, 47 Vt. 709, 713; Martin v. Maine Cent. Ry. Co. (Me.) 21 Atl. 740; Drexel v. Berney, 122 U. S. 241, 253, 7 Sup. Ct. 1200, 30 L. Ed. 1219; Dickerson v. Colgrove, 100 U. S. 578, 584, 25 L. Ed. 618; Kirk v. Hamilton, 102 U. S. 68, 76, 78, 26 L. Ed. 79; Wehrman v. Conklin, 155 U. S. 314, 327, 15 Sup. Ct. 129, 39 L. Ed. 167; Bigelow on Estoppel (4th Ed.) pp. 543, 544; 2 Herman on Estoppel, §§ 1297, 1298. There was no error in giving effect to an estoppel by matter in pais as a defense at law, if the defense was otherwise tenable—a subject which will be considered later.

What is treated by counsel as a special finding does not meet the requirements of the act of Congress (sections 649, 700, Rev. St. [U. S. Comp. St. 1901, pp. 525, 570]), as uniformly interpreted by the Supreme Court and the several Circuit Courts of Appeals. It does not respond to all the issues raised by the pleadings, and is therefore incomplete. This is probably because some of the issues were deemed immaterial, in view of the conclusions of law to which the court came. But a special finding of facts should be the equivalent of the special verdict of a jury, and should cover all the issues, so that in the event of proceedings in error, if the trial court's conclusions of law are deemed incorrect, and if the proceedings are otherwise without error, the appellate court may, under section

701, Rev. St., direct such judgment as the special finding requires, without the necessity of awarding a new trial. Ft. Scott v. Hickman, 112 U. S. 150, 165, 5 Sup. Ct. 56, 28 L. Ed. 636.

In actions at law, where a trial by jury is waived, the duty of finding the facts is placed upon the trial court. We have no authority to examine the evidence for the purpose of finding the ultimate facts, or of correcting or completing a special finding which is imperfect or incomplete. Sun Mutual Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 500, 1 Sup. Ct. 582, 27 L. Ed. 337; Lehnen v. Dickson, 148 U. S. 71, 77, 13 Sup. Ct. 481, 37 L. Ed. 373. To meet the requirements of the statute, as defined in the decisions of the Supreme Court and of the several Circuit Courts of Appeals, a special finding should be a clear and concise statement of the ultimate facts, and not a statement, report, or recapitulation of evidence from which such facts may be found or inferred. The ultimate facts must be so stated that, without inferences, or comparisons, or balancing testimony, or weighing evidence, the case may be determined by the application of pertinent rules of law. If any ultimate fact material to the issues is to be inferred from the whole evidence, or from other facts proved or admitted, the inference must be drawn by the trial court, and the fact must be stated in the finding. Like the special verdict of a jury, a special finding can present only questions of law. Barnes v. Williams, 11 Wheat. 415, 6 L. Ed. 508; Graham v. Bayne, 18 How. 60, 15 L. Ed. 265; Guild v. Frontin, 18 How. 135, 15 L. Ed. 290; Burr v. Des Moines, 1 Wall. 99, 17 L. Ed. 561; Norris v. Jackson, 9 Wall. 125, 19 L. Ed. 608; Miller v. Life Insurance Co., 12 Wall. 284, 301, 20 L. Ed. 398; Crews v. Brewer, 19 Wall. 70, 22 L. Ed. 63; Tyng v. Grinnell, 92 U. S. 467, 472, 23 L. Ed. 733; Raimond v. Terrebonne Parish, 132 U. S. 192, 10 Sup. Ct. 57, 33 L. Ed. 309; British Queen Mining Co. v. Baker Silver Mining Co., 139 U. S. 222, 11 Sup. Ct. 523, 35 L. Ed. 147; Wilson v. Merchants' Loan & Trust Co., 183 U. S. 121, 126, 22 Sup. Ct. 55, 46 L. Ed. 113; Mercantile Trust Co. v. Wood, 8 C. C. A. 658, 60 Fed. 346; Kentucky, etc., Co. v. Hamilton, 11 C. C. A. 42, 63 Fed. 93; Minchen v. Hart, 18 C. C. A. 570, 72 Fed. 294; Burnham v. North Chicago St. Ry. Co., 23 C. C. A. 677, 78 Fed. 101; Packer v. Whittier, 33 C. C. A. 658, 91 Fed. 511; State Nat'l Bank v. Smith, 36 C. C. A. 412, 416, 94 Fed. 605; American Nat'l Bank v. Watkins, 56 C. C. A. 111, 119 Fed. 545; Powers v. United States, 56 C. C. A. 128, 119 Fed. 562.

The supposed special finding of facts comprises 196 pages of the printed record, being 134 pages without the exhibits and 62 pages of exhibits. In addition to the exhibits, there are unnecessarily and improperly set forth at length the pleadings, reports of the master, orders and decree in a creditors' suit, records of corporate meetings, and much letter correspondence. It was evidently intended to set forth substantially everything presented to the trial court, as would be done if it were contemplated that this court could revise the action of the trial court in finding the facts, or could make a finding for itself. The evidence seems to have been somewhat condensed, and with some conclusions drawn there-

from by the court treated as a special finding. In some instances facts of an evidential character are stated from which a material ultimate fact may be inferred, but is not found. In these circumstances it has been difficult to determine what ultimate facts have been found, and to extract them from the 196 pages of the printed record covered by the supposed special finding. Separated from the matter unnecessarily and improperly stated, these facts would cover less than 20 pages.

While the special finding under consideration does not meet the requirements of the act of Congress, it does sufficiently respond to some of the issues raised by the pleadings, although not responding to others. In this situation the finding may be examined to ascertain whether the ultimate facts found and stated therein are decisive of the controversy, and determine what judgments should be rendered, irrespective of any response which could be made to the issues upon which the finding is silent. If, under a correct application of legal principles, the facts adequately found and stated determine the cases, the imperfection in the special finding becomes immaterial, and the present judgments must be affirmed, or other judgments must be directed in their stead, as the facts found and stated may require. But if the facts found do not, under the application of pertinent rules of law, determine the cases, the judgments must be reversed, and a new trial awarded. In the latter event, the Circuit Court will be precluded from again adjudging in favor of the defendants upon the facts declared by the judgment of reversal to be insufficient to sustain the present judgments, and it will be incumbent upon that court to proceed to the trial and proper determination of the other issues. Ex parte French, 91 U. S. 423, 426, 23 L. Ed. 249; Ft. Scott v. Hickman, 112 U. S. 150, 165, 5 Sup. Ct. 56, 28 L. Ed. 636.

As before stated, these are actions by creditors of the Kansas Company against some of its stockholders. One object of plaintiffs is to enforce a claimed unpaid subscription to additional stock issued by the corporation. This matter is not difficult of disposition. The claim is that the company, without any legitimate basis therefor, declared a stock dividend of 50 per cent. upon its capital stock, which was gratuitously distributed among and accepted by its stockholders, including defendants, and that the law implies a promise on the part of those who received the additional stock to pay par value therefor when called upon by creditors. But the law implies such a promise only in favor of subsequent creditors, who are presumed to have extended credit to the corporation on the faith of the increased stock, and they alone are entitled to enforce their claims against those accepting that stock. Handley v. Stutz, 139 U. S. 417, 435, 11 Sup. Ct. 117, 34 L. Ed. 706. Plaintiffs' petitions and the special finding show unmistakably that the guaranties and other obligations of the Kansas Company, which are the foundation of plaintiffs' actions, had been entered into and were outstanding before the declaration of the stock dividend, and before the acceptance of the additional stock by defendants. That stock could not, therefore, have been a factor in enabling the company,

to procure credit upon or acceptance of these guaranties and other obligations. The Circuit Court properly held, under the facts, that the acceptance of the stock dividend did not create any liability to plaintiffs.

One object in the transaction between the Kansas Company and the Missouri Company was to transfer to the latter all of the stock of the former, and to thus enable the Missouri Company to control the affairs of the Kansas Company, and to exercise its powers through the use of its name. Whatever may have been the effect of the transaction in other respects, it was in this respect beyond the powers of the Missouri Company, and void. The settled rule is that a corporation possesses only such powers as are expressed or fairly implied in the statute by or under which it is created; that the enumeration of these powers implies the exclusion of all others; and that any ambiguity or doubt respecting the possession of any particular power arising out of the terms used in the statute, is to be resolved against its possession. This rule is fully recognized in the state of Missouri. State ex rel. v. Lincoln Trust Co., 144 Mo. 562, 46 S. W. 593; Newland Hotel Co. v. Lowe Furniture Co., 73 Mo. App. 135. Where it is not otherwise provided, the implication in a grant of corporate power and life is that the corporation shall exercise its powers and carry on its business through its own officers and employés, and not indirectly, through another corporation operated under its control, and that it shall maintain an independent corporate existence, and not surrender the control of its affairs or the exercise of its powers to another corporation. Conceding that a corporation of a private character, not charged with any public duties, may, in pursuance of appropriate action on the part of its stockholders, sell all of its property, wind up its affairs, and permanently retire from business, still, in the absence of express authorization, neither the corporation nor its stockholders can, incidental to the sale of its property or otherwise, clothe another corporation with the right to maintain the corporate life or exercise the corporate powers. These views are sustained, and the reasons therefor are fully set forth in De La Vergne Co. v. German Savings Institution, 175 U. S. 40, 54, 20 Sup. Ct. 20, 44 L. Ed. 66, Buckeye Marble & Freestone Co. v. Harvey (Tenn.) 20 S. W. 427, 18 L. R. A. 252, 36 Am. St. Rep. 71, Easum v. Buckeye Brewing Co. (C. C.) 51 Fed. 156, and in the cases there cited. The De La Vergne Case presented the question whether one company could purchase with its own stock the stock of another company which was insolvent and had ceased to do business; the purpose being to prevent the reorganization of the latter company, and to obtain its patronage. The court declared the purchase ultra vires of the purchasing company and void, saying:

"But as the powers of corporations created by legislative act are limited to such as the act expressly confers, and the enumeration of these implies the exclusion of all others, it follows that, unless express permission be given to do so, it is not within the general powers of a corporation to purchase the stock of other corporations for the purpose of controlling their management."

The only authority of the Missouri Company to purchase stock in another corporation is found in subdivision 9, § 2839, Rev. St.

Mo. 1889, which reads: "To buy and sell all kinds of government, state, municipal and other bonds, and all kinds of negotiable and non-negotiable paper, stocks and other investment securities." The context shows very clearly that the purpose was not to authorize the purchase of all of the stock of another company for the purpose of controlling its management, but to authorize the buying and selling of stocks as investment securities, in like manner as government bonds and the other securities named are bought and sold. Controlling the management of a corporation of another state through the ownership of its entire stock is not buying or selling investment securities, nor is it fairly incidental thereto. The hazards of such a venture are altogether repugnant to the purposes for which the Missouri Company was formed, which included the handling and investing of the money of others, executing trusts under deeds and wills, acting as guardian of infants and insane persons, and guarantying the fidelity of persons holding places of public or private trust; all requiring the maintenance of a high standard of credit and stability on the part of that company. It is impossible to escape the conclusion that the purchase of the Kansas Company's stock was beyond the powers of the Missouri Company.

In the absence of any established rule of decision in the state of Missouri in respect of the effect of corporate acts which are ultra vires (and no local rule of decision has been called to our attention by counsel), we must apply to this case the rule recognized in the Supreme Court of the United States. That rule, as stated in Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24, 59, 11 Sup. Ct. 478, 35 L. Ed. 55, and as applied in many subsequent cases, is:

"A contract of a corporation which is ultra vires, in the proper sense—that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature —is not voidable only, but wholly void, and of no legal effect. The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. When a corporation is acting within the general scope of the powers conferred upon it by the Legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisites to its existence or to its action, because such requisites might in fact have been complied with. But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation nor the other party to the contract can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws."

See, also, McCormick v. Market Bank, 165 U. S. 538, 17 Sup. Ct. 433, 41 L. Ed. 817; California Bank v. Kennedy, 167 U. S. 362, 367, 17 Sup. Ct. 831, 42 L. Ed. 198; Concord First National Bank v. Hawkins, 174 U. S. 364, 19 Sup. Ct. 739, 43 L. Ed. 1007; Thomas v. Railroad Co., 101 U. S. 71, 25 L. Ed. 950; Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Pennsylvania R. R. Co. v. St. Louis, etc., R. R. Co., 118 U. S. 290, 6 Sup. Ct. 1094, 30 L. Ed. 83; Schofield v. Goodrich Bros. Banking Co., 39 C. C. A. 76, 98 Fed. 271.

What has been said goes far to support the contention that the transaction between the two companies was also ultra vires of the Kansas Company, but it is unnecessary to definitely determine that question, because if the transaction was beyond the corporate powers of either company, it is as invalid as if beyond the corporate powers of both. Louisville & Nashville Railroad v. Kentucky, 161 U. S. 677, 692, 16 Sup. Ct. 714, 40 L. Ed. 849. Defendants' transfer of their stock in the Kansas Company was a nullity. Nothing done in pursuance of the transfer, no acquiescence therein, and no receipt of benefits therefrom, could infuse validity into that act, or prevent the successful assertion of its nullity. The claimed estoppel is not tenable. The liability for the corporate debts, with which the holders of the Kansas Company's stock were charged, under the Constitution and laws of Kansas, was not extinguished or discharged by the transfer. That liability did not pass to the Missouri Company, because it could not, and therefore did not, become a stockholder in the Kansas Company. It follows that defendants continued to be stockholders in the Kansas Company, and remained liable for the corporate debts in like manner as if the transfer had never occurred.

For another reason the defendants' transfer of their stock in the Kansas Company was equally ineffectual to discharge them from liability under the Constitution and laws of Kansas for the existing debts of the company. The transfer was not made in the ordinary course of business, or at a time when the corporate business was being prosecuted, and the corporate life maintained, in the usual manner. The indebtedness of the company upon its direct obligations almost equaled its assets, and its contingent indebtedness upon outstanding guaranties exceeded its assets many times. The holders of the company's stock were obligated, something like sureties or guarantors, for the payment of this indebtedness. In these circumstances, by a vote of these stockholders, the Kansas Company transferred all of its assets to the Missouri Company, and completely divested itself of all means of paying its debts. This extracted all substantial or appreciable value from the stock, and made it a mere indicator of the holders' liability for the corporate debts. In a practical sense, it made the stockholders the principal debtors. A transfer of stock by stockholders in such a situation, if effective at all, accomplishes little more than an avoidance of a fixed and certain liability, and is the perpetration of a great wrong upon creditors. We of course assume that, as stated in the finding, the transfer was without fraud in fact and in good faith, but it was so obviously violative of the rights of the corporate creditors, and was so clearly injurious to them, that it was fraudulent in legal contemplation, no matter with what intent, or in what belief as to their own rights or those of the creditors, the stockholders may have acted. That the assets and the stock were transferred at substantially the same time, and as a single transaction, does not avoid or lessen the legal fraud, since the necessary effect of stripping the company of its assets was to disable it from paying its debts, and to increase the occasion or necessity for creditors to resort to the individual liability of the stockholders for the payment of their claims—a matter which the stockholders were bound to know. Nor does it change the result that the

Missouri Company agreed with the Kansas Company and its stock-holders, in consideration of the transfer of the assets and stock, to pay all claims then existing or thereafter arising against the Kansas Company or any of its stockholders, and to save them harmless in the premises. That did not pay the corporate debts or discharge the stock-holders from liability, nor did it substitute the Missouri Company in place of the Kansas Company as the debtor. Whether the Missouri Company could and would perform this agreement is a risk which was assumed by the Kansas Company and its stockholders, but not by its creditors. No possible arrangement among the Kansas Company, its stockholders, and the Missouri Company, made after they had wholly disabled the Kansas Company from paying its debts, or made in the immediate contemplation of so doing, could destroy or affect the right of the creditors of the Kansas Company to enforce their demands against its stockholders to the full extent of the liability imposed by law. There is no finding that the holders of the indebtedness here sued upon accepted the Missouri Company as a substituted debtor, or that they agreed to discharge or release the Kansas Company or its stockholders; nor can such an agreement be implied, as a matter of law, from the facts found, or any of them. True, the holders of these claims treated and dealt with the Missouri Company as having succeeded to the business of the Kansas Company, and as having agreed to discharge its debts and liabilities. They also established their claims in the receivership suit, and accepted dividends derived from a sale of the entire assets of the Missouri Company, a material portion of which was not obtained through the Kansas Company. But there is nothing in this which is inconsistent with a purpose and right to assert and enforce these claims against the Kansas Company and its stockholders. Indeed, in the receivership suit these claims were proved against both companies, and the fair legal inference from the proceedings is that they were allowed by the master and the court against both companies. A creditor who collects a portion of his claim from a third person, who after the debt is contracted agrees with the debtor to pay it, does not thereby discharge the debtor, or become estopped from collecting the balance from a surety or guarantor. There is in this no election between inconsistent claims or remedies. The stockholders of the Kansas Company were benefited, not injured, by what was done by these creditors.

For the reasons stated, we are clearly of opinion that the transfer of defendants' stock did not put an end to their liability as stockholders for the existing debts of the company, and that plaintiffs are not estopped to assail that transfer or to enforce that liability.

The remaining question relates to the statute of limitations. The Kansas Company suspended business August 1, 1890, and, that suspension still continuing, a cause of action upon each debt of the company arose to the creditor against each stockholder August 1, 1891, whether the debt was matured or unmatured, and a like cause of action arose upon the company's contingent liability upon each of its outstanding guaranties upon the happening of the contingency which ripened the liability into an actual debt. The entire indebtedness sued upon in the Anglo-American cases rests upon guaranties which were

outstanding August 1, 1890, but the finding, which is incomplete, as before shown, does not disclose when the guaranties ripened into actual debts, and therefore renders it impossible to determine whether these actions are barred as to any portion of the indebtedness.    As before stated, the period of limitation in the state of Kansas for commencing proceedings to enforce a stockholder's additional liability is three years, but by the law of the state (section 4449, Gen. St. 1901), the period limited for the commencement of the action does not run while the person against whom the cause of action exists is out of the state.   The finding shows that the defendants in the Ramsden Cases were out of the state during the entire period between the accrual of the causes of action and the time when the actions were commenced.   These actions are therefore not barred as to any part of the indebtedness.

It results that the facts found do not sustain the judgments for defendants, and do not indicate for whom final judgments should be rendered.   The judgments are therefore reversed, and the cases are remanded to the court below, with a direction to grant a new trial in each case, and to take such further proceedings therein as may not be inconsistent with the views expressed in this opinion.

## On Petition for Rehearing.

### (November 1, 1904.)

1. It is insisted that in the Ramsden cases the action of the Circuit Court in rendering judgment upon the special finding cannot be reviewed, because there was no written stipulation waiving a jury.   Rev. St. §§ 649, 700 [U. S. Comp. St. 1901, pp. 525, 570].   This point is made now for the first time.   The judgment entries recite that these cases, like the Lombard cases, were tried to the court; trial by jury being waived by agreement of the parties.   The record also discloses that there were written stipulations in the Lombard cases waiving a jury and requesting a special finding, and that there was another written stipulation, entitled in both the Lombard and Ramsden cases, to the effect that but one finding should "be signed and filed and entered of record for all."   As these stipulations clearly contemplated a trial to the court in all of the cases and a single special finding for all, and as the cases could not be tried to the court without waiving a jury, it sufficiently appears that the waiver of a jury was by written stipulation in all of the cases.   Boogher v. Insurance Co., 103 U. S. 90, 97, 26 L. Ed. 310; Supervisors v. Kennicott, 103 U. S. 554, 556, 26 L. Ed. 486.

2. The contention that the transfer of the Kansas Company's stock was not illegal for want of power in the Missouri Company to acquire the stock is renewed in this manner:

"There was not, as assumed by the court, any purchase of stock in the ordinary sense of the word. * * * The Kansas Company went out of existence and its stock was practically retired. * * * The transfer of the stock was only an incident to the acquisition of the property and an evidence of title.   Under such circumstances the transaction was not void. * * * There is not involved here, as assumed in the opinion, any question as to retiring a company in business.   The transaction was simply a reorganization by the formation of a new company and the dissolution of the old."

There seems to be in this a misapprehension of the opinion; but, without dwelling upon that, we will dispose of the contention in the form in which it is renewed. If the transaction was the formation of a new company and the dissolution of the old, that did not terminate the liability of the defendants as stockholders of the Kansas Company. Dissolution of a corporation does not extinguish the liability of the stockholders. If the old company was dissolved and its stock retired, not purchased and transferred, no question of ultra vires arises. But, if there was a purchase and transfer of the stock, a question of power does arise, and that question is, not whether the old company, by way of winding up its affairs, could transfer its property to the new company in consideration for stock in the latter to be distributed among the stockholders of the former, or to be sold and the proceeds so distributed, but whether the new corporation could acquire and hold the stock of the old one as a means of controlling it. The cases of Holmes & Griggs Manufacturing Co. v. Holmes & Wessell Metal Co., 127 N. Y. 252, 27 N. E. 831, 24 Am. St. Rep. 448, and Treadwell v. Salisbury Manufacturing Co., 7 Gray, 393, 404, 66 Am. Dec. 490, tend very strongly to sustain the power of the old company to so dispose of its property, but they do not sustain the power of the new company to so acquire and hold the stock of the old one, and the weight of the New York case as an authority respecting the power of a corporation to so dispose of its property is much impaired by People v. Ballard, 134 N. Y. 269, 294, 32 N. E. 54, 17 L. R. A. 737. In McCutcheon v. Merz Capsule Co., 19 C. C. A. 108, 114, 71 Fed. 787, 31 L. R. A. 415, the Court of Appeals for the Sixth Circuit, while conceding the power of a corporation to so dispose of its property, emphatically denied its power to acquire and hold the stock of another corporation for the purpose of controlling it. But it does not alter the situation that the transfer of the property of the old company may have been a permissible transaction as respects both companies, because neither the right of the old company to dispose of its property nor the right of the new to acquire it furnishes any reason for saying that the latter could acquire and hold the stock of the other. The transfer of the stock of the old company was not a necessary incident to the transfer of its property, or at all essential to investing the new company with complete title to or control over the property.

3. Each state may determine what powers shall be possessed by corporations organized under its authority, and what effect shall attach to acts done by such corporations beyond their powers. The question is one of state policy, and therefore a matter of local and not of general law. Sioux City, etc., Co. v. Trust Co., 173 U. S. 99, 106, 111, 19 Sup. Ct. 341, 43 L. Ed. 628; Id., 27 C. C. A. 73, 77, 82 Fed. 124; Schofield v. Goodrich Bros. Banking Co., 39 C. C. A. 76, 98 Fed. 271. The claim is now made that the settled rule of decision in the state of Missouri is that after a corporate contract has been executed by one party the defense of ultra vires is not open to the other; in other words, that a corporate contract which is ultra vires is voidable, not void. The decision of the Kansas City Court of Appeals in City of Goodland v. Bank, 74 Mo. App. 365, is alone cited in support of this contention. A fixed and settled rule of decision in a state court of last resort estab-

lishes the law of the state in such manner as to bind the federal courts in all matters controlled by the state law; but the opinions of intermediate appellate courts, like the Kansas City Court of Appeals, while entitled to great respect and regarded as persuasive authority, are not controlling upon the federal courts, because they do not settle the law of the state. Of course, the present question is whether the Missouri Company's acquisition of the stock of the Kansas Company and the incurrence of the stockholder's liability which is inseparable from ownership of the stock—a liability which has not been discharged and remains an executory obligation—was void in toto or only voidable; in other words, whether the act of a corporation which is not within the scope of its corporate powers, and is therefore prohibited (State v. Lincoln Trust Co., 144 Mo. 562, 586, 587, 46 S. W. 593; Const. Mo. art. 12, § 7; Householder v. City of Kansas, 83 Mo. 488), can have or be given the effect of placing upon the corporation an enforceable executory obligation. While there is room for a contention that the decisions of the Supreme Court of the state are conflicting and leave the question unsettled, we think the correct view of the decisions of that court—giving effect to each according to the particular case then under consideration—is that they establish a rule which is essentially the same as that recognized in the Supreme Court of the United States, viz., that, where the contract which is ultra vires has been fully performed on both sides (as in the instance of a consummated conveyance to a corporation, imposing no executory obligation), what has been done will not be undone at the suit of either party (McIndoe v. St. Louis, 10 Mo. 575; Chambers v. St. Louis, 29 Mo. 543; Land v. Coffman, 50 Mo. 243, 255; Ragan v. McElroy, 98 Mo. 349, 11 S. W. 735; Connecticut Mutual Life Ins. Co. v. Smith, 117 Mo. 261, 22 S. W. 623, 38 Am. St. Rep. 656), but where any part of the contract remains executory its invalidity may be effectively asserted, notwithstanding its partial performance, because the power to enter into the contract or to make it obligatory at all has been withheld by the authority which created the corporation and defined its powers (Hoagland v. Hannibal & St. Joseph R. R. Co., 39 Mo. 451, 459; St. Joseph v. Saville, 39 Mo. 460, 466; Pacific R. R. Co. v. Seely, 45 Mo. 212, 220, 221, 100 Am. Dec. 369; State ex rel. v. Murphy, 134 Mo. 548, 567, 568, 31 S. W. 784, 34 S. W. 51, 35 S. W. 1132, 34 L. R. A. 369, 56 Am. St. Rep. 515; Bertche v. Equitable, etc., Ass'n, 147 Mo. 343, 359–362, 48 S. W. 954, 71 Am. St. Rep. 571; Lovelace v. Pratt, 163 Mo. 70, 76, 63 S. W. 383; Newland Hotel Co. v. Furniture Co., 73 Mo. App. 135, 137; Kansas City v. O'Connor, 82 Mo. App. 655, 660–663; Caston v. Stafford, 92 Mo. App. 182, 188).

Moreover, there are indications that the decisions of the Supreme Court of the state upon this subject are believed by that court to be in accord with those of the Supreme Court of the United States. The opinions in Hoagland v. Hannibal & St. Joseph R. R. Co. and St Joseph v. Saville, supra, cite with full approval Pearce v. Madison, etc., R. R. Co., 21 How. 441, 16 L. Ed. 184, where it was held that there could be no recovery against a railroad company upon a note given for the purchase price of a steamboat actually delivered to and used by the company, but without any sanction therefor in its charter. In State ex rel. v.

Murphy, supra, where it was held that the doctrine of estoppel could not be applied to validate a corporate contract which the corporation had no power to make, the court cites Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Thomas v. Railroad Co., 101 U. S. 71, 25 L. Ed. 950, and Pennsylvania R. R. Co. v. St. Louis, etc., R. R. Co., 118 U. S. 290, 6 Sup. Ct. 1094, 30 L. Ed. 83, in support of its ruling. In Kansas City v. O'Connor, supra, a later case than City of Goodland v. Bank, relied upon by counsel, the Kansas City Court of Appeals also cites several cases in the Supreme Court of the United States, holding that a corporate contract which is ultra vires is not voidable merely, but wholly void, and then quotes with entire approval from Trust Co. v. Miller, 33 N. J. Eq. 155, 162, as follows:

"While it must be admitted that this doctrine has not received the sanction of every eminent judge who has been called upon to enforce it, yet I think it is now vouched for by such august authority, and is so manifestly supported by sound reason and the highest considerations of policy, that it must hereafter be accepted universally as expressing the true rule of judgment in such cases."

In State v. Lincoln Trust Co., supra, decisions both federal and state are cited and quoted from as sustaining the conclusion "that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others." Evidently with a purpose to enforce respect for and adherence to this principle of law, the Constitution of the state declares:

"No corporation shall engage in business other than that expressly authorized in its charter or the law under which it may have been or hereafter may be organized." Article 12, § 7.

The prohibitory clauses in the state Constitution are deemed self-enforcing. Householder v. City of Kansas, 83 Mo. 488. Thus a Missouri corporation is both impliedly and expressly prohibited from exercising any power other than those granted in its charter or the law under which it is formed. A contract made in violation of this prohibition is unlawful and of no effect. No act of the corporation or the other contracting party, or of the stockholders or creditors of the corporation, can render the contract enforceable, because they are powerless to make lawful that which is made unlawful by the statutes and Constitution of the state.

4. Another contention seems to be that, while a corporation may not be estopped from asserting the invalidity of a contract made outside of its powers, such an estoppel can arise against a creditor of the corporation, because he is capable of contracting. The true rule is that no one can make an enforceable contract with a corporation which is beyond its powers, and no action by others can give enforceable quality to such a contract. The cases of Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 468, 6 Sup. Ct. 809, 29 L. Ed. 963, and Fogg v. Blair, 133 U. S. 534, 540, 10 Sup. Ct. 338, 33 L. Ed. 721, do not hold otherwise. In the first case a final decree in a railroad receivership which resulted in foreclosure sales, apportioned the floating indebtedness of the receivership and certain labor claims among three several railroad properties on the basis of the relative length of each road, and made the payment of such indebtedness a charge upon the

properties superior to mortgages upon the respective roads. Before the receivership two of the three roads owned by separate companies had been sold and conveyed to the company owning the third, and thereafter, including the period of the receivership, the three roads had been operated as one property. The receivership covered a period of ten years, during the last eight of which the trustee under the mortgage upon the Paris & Decatur road, one of the three, was a party to the suit. Holders of bonds secured by that mortgage objected to the apportionment of the floating indebtedness and labor claims, on the ground that the sale and conveyance of that road preceding the receivership was ultra vires. It was in response to this contention that the court said, after referring to the grounds upon which the Circuit Court had rested its decision:

"Independently of this, it is entirely sufficient to rest our conclusion on the principle that nonaction on the part of the Paris & Decatur bondholders and their trustee, which allowed the court and the receivers to go on during the entire litigation contracting debts in respect to the whole line operated as a unit, and administering the property as one, under circumstances where, as shown, it was and is impossible to separate the interests as to expenditures and benefits in respect to the matters now questioned, and where important rights have accrued on the faith of the unity of the interests, amounts to such acquiescence as should operate as an estoppel."

The thing which the bondholders were held estopped to question was the action of the court in operating the three roads as one property. With the parties in interest before it, and none objecting, the court could have done this, regardless of the sale prior to the receivership.

The facts in Fogg v. Blair were these: One company purchased in 1873 all of the property of another and agreed to assume and pay its debts. A creditor of the old company obtained a judgment against it in 1881, upon an obligation existing at the time of the sale. In 1884 the creditor obtained a decree against both the old and new company, adjudging them to be jointly and severally liable for the payment of the judgment. The creditor then intervened in a pending foreclosure suit brought to foreclose a mortgage given upon the property by the new company after the sale and before the creditor had asserted his claim against either company. The purpose of the intervention was to have the creditor's judgment satisfied out of the property in advance of the bonds secured by the mortgage. An examination of the case as reported in the Supreme Court Reports and in the Federal Reporter (27 Fed. 176) shows that the claim was, not that the old company was without authority to sell the property or the new without authority to purchase it, but only "that the old corporation could not transfer its property to the new corporation without the new corporation becoming trustee for all the creditors of the old company; that its property was thus affected with a trust, and could not be subjected to a mortgage so as to give priority to the bonds secured over the demands of creditors existing at the time of such transfer." Properly termed, the question was one, not of ultra vires, but of a fraudulent disposition of property as against creditors. It was under these circumstances that the court said:

"We do not attach any weight to the objection that the transfer by the old company of its entire property to the new company was illegal and ultra vires,

and therefore to be disregarded: However such a transfer might be considered in a suit to set it aside, the objection does not lie in the mouth of the appellant; for he has proceeded against the new company, and obtained, upon the assumed validity of such transfer, a decree that it pay his judgment, which is founded upon a demand that company agreed to assume as part of the consideration of the transfer."

In view of a matter yet to be mentioned, it is to be observed that the creditor was held to be estopped, not from enforcing his claim against the old company, but from pursuing its property fraudulently transferred to the new company, and from questioning the priority of the lien of the new company's mortgage. The difference between the application of the doctrine of estoppel to corporate acts which are fraudulent and voidable, and to those which are ultra vires and void, is obvious.

5. Another contention, which is quite apart from the validity or invalidity of the transfer of the defendants' stock in the Kansas Company, is that a creditor of a corporation may lawfully contract to surrender or waive the right to enforce the liability of its stockholders, and that, having the capacity so to contract, the creditor may become estopped from enforcing this liability. We regard the contention as sound, and turn to the claims advanced in support of its application to the present case. They are: (a) That the finding shows that these creditors accepted the Missouri Company as a substituted debtor, meaning that they released the Kansas Company, and consequently its stockholders, which would be a novation; (b) that the finding shows conduct on the part of these creditors which in law precludes them from now enforcing the stockholders' liability of defendants.

In the nature of things there is no acceptance of one person as a substituted debtor where there is no release of another, but there may be a release of a debtor without substituting another in his place. In this sense the two things are different, but both must concur to effect a novation, which is the substitution of a new debtor in the place of an old one with intent to release the latter. Was there a novation here? There is no finding that there was, nor that there was a release of the Kansas Company. But it is urged that there is an express finding that "the Missouri Company was permitted to go on and *act as the substitute* for the Kansas Company." The four words which are emphasized by the italics do not stand alone. They should be read in connection with other portions of the finding, not independently of them, and when so read we think they mean nothing more than, as stated in the opinion, that the Missouri Company was "treated and dealt with as having succeeded to the business of the Kansas Company, and as having agreed to discharge its debts and liabilities." To isolate the words relied upon and to give to them the effect claimed would be to ignore other portions of the finding, which state that the claims here in question were separately proved in the receivership proceedings against each of the companies, and were allowed by the court, and that one of the plaintiffs, the Anglo-American Company, also endeavored to enforce its claim against the Kansas Company by an action commenced in the courts of Kansas, but was unable to do so because no proper officer of the company upon whom to make service could be found, although successive writs were issued and attempted to be served.

The question is not affected by the contracts entered into with the Missouri Company by the Anglo-American Company, one of the plaintiffs, and by the Edinburgh Company, one of the assignors of the plaintiff Ramsden. These contracts were wholly prospective in their terms, and did not attempt to affect any right acquired or liability incurred before they were made. Neither made reference to the prior contract with the Kansas Company, and the finding states that the Edinburgh contract "contains no agreement or provision for the release or discharge of the Kansas Company." The Anglo-American contract is set forth in the finding, and its terms show that the same statement would apply to it. While by this contract the Anglo-American Company agreed "to employ and retain" the Missouri Company as its agent for purposes therein named, the word "retain" had no reference to anything which preceded the making of the contract, and was a mere word of employment. The increased rate of interest stipulated for in this contract was confined to "investments made by the agent company for the principal company on and after the execution of this contract," and the increased rate of interest paid by the Missouri Company is stated to have been "interest under the new contract," including interest upon extensions made by that company of prior loans made by the Kansas Company. The extensions were the same as new loans, so far as the right of the Anglo-American Company to interest was concerned. Nothing in these matters gives color to the claim that there was a substitution of debtors, in the sense that the Kansas Company was released and discharged from further obligation. We think there was no novation.

The claim that the finding shows conduct on the part of these creditors which in law precludes them from now enforcing the stockholders' liability of the defendants is rested upon the proposition that by accepting the benefits of the contract or transaction between the Kansas Company and its stockholders upon the one side and the Missouri Company upon the other the creditors have subjected themselves to its obligations. But that contract or transaction did not impose or purport to impose any obligation upon the creditors in the event of their acceptance of its benefits or otherwise. The stockholders of the Kansas Company exacted of the Missouri Company a stipulation to save them harmless from any and all liability on claims arising out of the Kansas Company's business. The creditors did nothing to prevent the Missouri Company from fulfilling its stipulation; and the stockholders were not led to act, or to forego action, to their prejudice, on the faith of any conduct of the creditors. How can there be an estoppel? The creditors originally had two means of enforcing payment of their claims—one by resorting to the property of the Kansas Company, and the other by resorting to the liability of its stockholders. The property was by the act of the stockholders transferred to the Missouri Company. The creditors acquiesced in this transfer, but that did not take from them the other security—the stockholders' liability. They also accepted certain benefits resulting from the transfer of the property, but this was as advantageous to the stockholders as it was to the creditors. Is this not a parallel case? A. holds a claim against B. for the payment of which C. is liable as surety or guarantor. B., the debtor, conveys all

of his property to D., upon the latter's promise to assume and pay all of the debtor's obligations, including that to A., and to save C. harmless from his suretyship or guaranty; but A. is not a party to that transaction. Subsequently A. receives interest and partial payments from D. Thereafter D. fails, and his assets, which include property other than that received from B., are exhausted in the partial satisfaction of the claims of A. and others. A. brings an action against C. to recover the balance of the claim. C. defends upon the ground that A. received interest and partial payments from D., and received a dividend from D.'s estate, and is therefore estopped from asserting the liability of C. Certainly there would be no estoppel in such a case, and yet it is not different from the one under consideration, save that here the creditor in the meantime also asserted the liability of the original debtor, and therefore clearly manifested that he had not released it or its sureties or guarantors, the stockholders.

It is said that it was admitted by the Anglo-American Company, and adjudged by the court in the receivership case, that the Missouri Company was the owner of the stock of the Kansas Company. There is a finding that the Anglo-American Company did admit in the receivership proceedings an allegation of a bill of interpleader, made largely by way of description, that the Missouri Company "took up and  *   *   *  held all the stock of the Kansas Company"; but there is no finding of any adjudication of ownership. The Kansas Company was a party to the receivership case, and the authority of the court over it in perfecting title to the property which it had transferred to the Missouri Company—a matter mentioned in the finding—was not because of or dependent upon the ownership of the Kansas Company's stock. The situation of the parties is the same as if the admission had not been made. The creditors received no benefit from it and the stockholders have not been prejudiced by it.

The case of Francklyn v. Sprague, 121 U. S. 215, 7 Sup. Ct. 951, 30 L. Ed. 936, is cited in support of the claim that to permit the creditors to obtain the benefits of the Missouri Company's contract of assumption, and not carry out its spirit in holding harmless the stockholders of the Kansas Company, is "subversive of the whole plan." The case cited has no similarity to this. The facts were these: A manufacturing partnership existed between several members of a family, including four minor children, whose interests were controlled by the administratrix of their grandfather's estate, who was also the guardian of their property. The partners conveyed all of the partnership property to a corporation; the guardian of the minors joining in the conveyance, under the express authority of a special act of the state Legislature, which was sustained in Hoyt v. Sprague, 103 U. S. 613, 26 L. Ed. 585. At the time of the conveyance the state of the account between the members of the partnership was such that a large balance stood to the credit of the minors by reason of moneys drawn out by other members. In return for the partnership property the members received stock in the corporation according to their interests in the partnership. Instead of adjusting the balance due to the minors by the issuance to them of a proportionally increased amount of stock, the payment of this and other partnership obligations was assumed by the corporation. Subse-

quently the corporation, becoming embarrassed, made an assignment for the benefit of creditors. A suit was brought on behalf of one of the minors to have his interest in the balance due to the four minors declared a superior lien or charge upon the property conveyed to the corporation and then in the hands of the assignee. The contention was that by the law of partnership this claim was a lien on the partnership property and followed it into the hands of the corporation. The conveyance to the corporation was absolute, and the minor, by reason of his competent representation through his guardian, was a participant in all that was done. The court said:

"Now, can it be justly contended that these debts due to the several partners, when they became the assumed debts of the corporation, continued to be liens on the property, as they had been when it was partnership property? We think not. This would have been subversive of the whole plan. The relation of the parties to the property was entirely changed. Their lien as partners, as well as their character of partners, was extinguished. A conveyance or release of property by one who has a lien on it necessarily extinguishes the lien. Mary Sprague, as administratrix and guardian, after conveying to the corporation all her interest and the interest of her wards in the property, parted with all right in it, and accepted in lieu of it shares for her aliquot part in the body of it, and the assumption and engagement of the corporation to pay the balance due to her on the accounts. Having conveyed and parted with the property by virtue of an authority conferred by law, her lien upon it was gone; and those who claim through and under her cannot set up any such lien." 121 U. S. 228, 7 Sup. Ct. 957, 30 L. Ed. 936.

If one of the Kansas Company's stockholders who participated in the transfer of the property of that company to the Missouri Company were attempting to have a debt owing to him by the Kansas Company and assumed by the Missouri Company declared a prior charge or lien upon that property the case might be in point, but it is without application here.

6. Because the petitions in these cases are indefinite, in that they do not disclose the nature of the obligations of the Kansas Company upon which the actions are founded, we are asked to presume that they are not founded upon guaranties, a right of action upon which could not arise against the stockholders until the happening of the contingency which ripened the company's liability into an actual debt, but are founded upon unconditional obligations, a right of action upon which arose against the stockholders one year after the company suspended business. It is said:

"The burden of proof was upon the plaintiff to plead and prove that his claim was contingent in its nature; otherwise, it must be presumed to have been direct."

No objection to the petitions in respect of this matter was taken in the court below, and it appears throughout the record that there was no purpose in that court to make any point upon the manner in which the indebtedness was stated in any of the petitions. The objection comes too late at this time. We are not concerned with the burden of proof or the evidence. The burden of proof may have been properly placed and carried, and the evidence may have been full and clear. As presented to us, the record simply shows an absence of any finding as to when the causes of action arose, and not, as in Stone v. United

States, 164 U. S. 380, 17 Sup. Ct. 71, 41 L. Ed. 477, a declaration that the party upon whom the burden of proof rested failed to carry it, in consequence of which judgment was rendered against him.

7. The statutes of Kansas contain this provision:

"Where the cause of action has arisen in another state or country, between nonresidents of this state, and by the laws of the state or country where the cause of action arose an action cannot be maintained thereon by reason of lapse of time, no action can be maintained thereon in this state." Gen. St. 1901, § 4450.

The parties were at all times nonresidents of Kansas. Did the causes of action arise in that state or elsewhere? The claim is that, being transitory, they arose wherever the defendants could have been sued, and that they did not arise in Kansas because the defendants were non-residents and out of the state. To sustain this proposition reference is made to decisions of the courts of Illinois and Nevada under somewhat similar statutes. Hyman v. McVeigh, 10 Chi. Leg. N. 157, reported in statement of another case, 32 N. E. 891; Osgood v. Artt (D. C.) 10 Fed. 365; Hyman v. Bayne, 83 Ill. 256; Wooley v. Yarnell, 142 Ill. 442, 449, 32 N. E. 891; Lewis v. Hyams, 26 Nev. 68, 63 Pac. 126, 64 Pac. 817. The Kansas statute was not borrowed from Illinois, as suggested by counsel. It was part of the Ohio Code of Civil Procedure (2 Swan & C. Rev. St. Ohio, p. 950), adopted in Kansas February 25, 1868 (Gen. St. Kan. 1868, c. 80, § 22, p. 634). The Illinois statute was enacted four years later (Sess. Laws 1871–72, p. 560, § 20), and does not contain the "nonresidents" clause. The Kansas statute does not seem to have been considered by the Supreme Court of that state or by the Supreme Court of Ohio. Similar statutes exist in other states, but the reported cases decided thereunder are few. The earlier cases in Illinois announced the view that a cause of action should be deemed to have arisen wherever jurisdiction of the defendant could have been obtained; in other words, that the state in which a cause of action arose is to be determined by inquiring where the defendant could have been served with process, and not where the acts or omissions occurred which gave the right to sue. Under that view the same cause of action could arise in more than one state, because it would arise anew if the defendant should go from one state to another and in that way subject himself to the service of process in the latter. The later cases in Illinois have greatly limited, if they have not entirely departed from, the view first announced. Wooley v. Yarnell, supra; Hibernian Banking Ass'n v. Commercial National Bank, 157 Ill. 524, 539, 41 N. E. 919; Janeway v. Burton, 201 Ill. 78, 66 N. E. 337. In Lewis v. Hyams, supra, the Supreme Court of Nevada followed the earlier decisions in Illinois.

Other cases declare what seems to be a more reasonable rule. Chevrier v. Robert, 6 Mont. 319, 12 Pac. 702, was an action brought in Montana upon a judgment rendered in Canada. The Montana statute of limitations was like that of Illinois, and the question presented for decision was whether the action was barred in Montana, on the ground that after the rendition of the judgment the defendant had resided in Nevada long enough for the statute of that state to bar the demand there. The court said:

"It is admitted that the cause of action first arose in Canada. Did it arise again in Nevada? If so, it also arose again in Montana, in November, 1884, when the respondent took up his residence here; and it may have arisen in a dozen other states or territories, where he may have temporarily resided, since the judgment was rendered in Canada. We do not believe this a fair interpretation of the law. A cause of action can arise but once; and, when it once accrues, it remains in force until it is extinguished, or satisfied, or barred by statute."

In Jackson v. Spittal, 5 L. R. C. P. 542, a cause of action was said to arise in that jurisdiction where the act is done which gives the plaintiff his cause of complaint; and in Durham v. Spence, 6 L. R. Ex. 46, it was said by Pigott, B.:

"I understand by 'cause of action' that which creates the necessity for bringing the action. No doubt, to make the act or omission complained of a cause of action, a contract must have preceded; but so, also, a negotiation must have preceded the making of the contract. Yet I should not include in the expression 'cause of action' that negotiation, nor any of the other circumstances that might form part of the necessary evidence in the cause as the groundwork of the cause of complaint, but only the cause of complaint itself; that is, the breach."

In the same case it was also said by Cleasby, B.:

"Now, the cause of action must have reference to some time, as well as to some place. Does, then, the consideration of the time when the cause of action arises give us any assistance in determining the place where it arises? I think it does. The cause of action arises when that is not done which ought to have been done, or that is done which ought not to have been done. But the time when the cause of action arises determines also the place where it arises; for when that occurs which is the cause of action, the place where it occurs is the place where the cause of action arises. I cannot avoid the conclusion that a cause of action arises where that takes place which first makes a cause of action. The contract does not make a cause of action; but a cause of action does arise when and where the person who has entered into the contract does or omits to do that which gives a cause of action."

To the same effect are Burckle v. Eckhart, 3 N. Y. 132; Veeder v. Baker, 83 N. Y. 156; Hibernia National Bank v. Lacombe, 84 N. Y. 367, 38 Am. Rep. 518; Toronto General Trust Co. v. Chicago, etc., R. R. Co., 32 Hun, 190; Shelby Steel Tube Co. v. Burgess Gun Co., 8 App. Div. 444, 40 N. Y. Supp. 871.

While the section under consideration does not seem to have been considered by the Supreme Court of Kansas, its proper interpretation is suggested by decisions of that court construing another closely related section. Section 4478 directs that certain actions must be brought in the county where the cause of action, or some part thereof, arose, as do also sections 4479 and 4483. Under section 4478 it is held that a cause of action arises in the county where the act or breach occurs which creates the necessity for bringing the action. Clay v. Hoysradt, 8 Kan. 74; Fay v. Edminston, 28 Kan. 105; Smith v. Collins, 42 Kan. 259, 21 Pac. 1058. The place where a cause of action arises is not determined by inquiring where it may be enforced. The two things are not the same. The right of action must arise, come into being, before it can be enforced anywhere, and when it has arisen the action for its enforcement, unless purely local, may be maintained in any state. As was said in Dennick v. Railroad Co., 103 U. S. 11, 17, 26 L. Ed. 439:

"It is, indeed, a right dependent solely on the statute of the state; but when the act is done for which the law says the person shall be liable, and the action by which the remedy is to be enforced is a personal and not a real action, and is of that character which the law recognizes as transitory and not local, we cannot see why the defendant may not be held liable in any court to whose jurisdiction he can be subjected by personal process or by voluntary appearance, as was the case here. It is difficult to understand how the nature of the remedy or the jurisdiction of the courts to enforce it is in any manner dependent on the question whether it is a statutory right or a common-law right. Wherever, by either the common law or the statute law of a state, a right of action has become fixed and a legal liability incurred, that liability may be enforced and the right of action pursued in any court which has jurisdiction of such matters and can obtain jurisdiction of the parties."

To the same effect are Texas & Pacific Ry. Co. v. Cox, 145 U. S. 593, 605, 12 Sup. Ct. 905, 36 L. Ed. 829; Huntington v. Attrill, 146 U. S. 657, 13 Sup. Ct. 224, 36 L. Ed. 1123; Whitman v. Oxford National Bank, 176 U. S. 559, 20 Sup. Ct. 477, 44 L. Ed. 587; Davis v. Mills, 194 U. S. 451, 24 Sup. Ct. 692, 48 L. Ed. 1067; Theroux v. Northern Pacific Railroad Co., 12 C. C. A. 52, 64 Fed. 84.

Where a statute gives a right of action not existing at common law, and the same statute or another contains a limitation directed to the enforcement of the new right so specifically as to qualify or condition the right itself, the limitation inheres in the right and follows it wherever it is attempted to be enforced (Theroux v. Northern Pacific Railroad Co., 12 C. C. A. 52, 64 Fed. 84; Davis v. Mills, 194 U. S. 451, 454, 24 Sup. Ct. 692, 48 L. Ed. 1067); but, subject to this exception, the general rule is that whether an action is barred is to be determined by the law of the forum, and that effect can be given to a bar arising under the laws of another state or country only when and to the extent that the law of the forum so provides. The Kansas statute does not broadly declare that all actions barred by the laws of another state or country shall be barred in that state, but gives effect to a bar arising elsewhere only when the cause of action arose elsewhere, between nonresidents of the state. Doubtless this is because the time within which such a cause of action shall be barred does not specially concern the state of Kansas, and may with greater propriety be left to the laws of the state where it arose. But the present causes of action are not of that class. They arose under the Constitution and laws of Kansas, and but for them would not have arisen at all. They arose because a corporation organized under the laws of the state, and having its existence within the state, suspended business for more than one year without paying its debts. The Constitution and laws of Kansas, operating upon conditions and occurrences within the state, gave the right to sue; and whether and when it shall be barred in the courts of that state is a matter of concern to the state, irrespective of the residence of the parties. In our opinion these causes of action arose in Kansas, according to both the letter and spirit of the statute, and the right to enforce them in the courts of that state is not affected by the statute of limitations of another state.

The petition for a rehearing is denied.