## WOOD *v.* GREEN *et al.*[*]

### (*Nashville.* December Term, 1914.)

1. **APPEAL AND ERROR. Assignments of error. Rule of court.**
Under Rule of Court, sec. 14, subsec. 3 (160 S. W., ix), requiring that, when the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence, with citation of the record where it and the ruling may be found, an assignment of error that "the chancellor erred in excluding from the hearing all evidence tending to show oral statements by one E. in the transactions involved under the petition herein, and particularly that part of such evidence as is set out at length in the wayside bills of exception filed by both parties," was not in compliance with the rule of court, and is overruled. (*Post, pp.* 586, 587.)

2. **ACCOUNT STATED. Implied assent of party. Transaction between banks.**
Where the N. Bank remitted $20,000 to New York to the account of the M. Bank, the vice president of the M. Bank seeing the entry on the books of the N. Bank and making no objection, there was an account stated between the parties, not to be reopened, in the absence of fraud, mistake, or surprise. (*Post, p.* 587.)

3. **BANKS AND BANKING. Certificate of deposit. Validity. Funds to support.**
Where the N. Bank issued a certificate of deposit in exchange for a draft of the same amount on New York issued by the M. Bank, the draft being held as a cash item by the N. Bank by instruction of its vice president, who was also president of the M. Bank, and not being presented for payment until after the fail-

---

[*] On the question as to what constitutes an account stated, see note in 27 L. R. A., 811. As to the effect of retaining statement of account to render it an account stated, see note in 29 L. R. A. (N. S.), 334. As to the imputation of knowledge of bank officers to bank, where officers are personally interested, see notes in 29 L. R. A. (N. S.), 558, and 49 L. R. A. (N. S.), 764. As to power of a corporation to deal in stock of other corporations, see note in 18 L. R. A., 252. And as to liability resulting from investing trust funds in corporate stock, see note in 44 L R. A. (N. S.), 930.

ure of the N. Bank, when it was presented to the receiver, payment was properly refused; the certificate not being valid in the hands of the M. Bank, since there was no money in the N. Bank on which the certificate of deposit could rest. (*Post, pp.* 587-589.)

4. **BANKS AND BANKING. Officers. Authority. Letter of introduction.**

Where the vice president of the N. Bank took to the M. Bank a letter, signed by the cashier of the N. Bank, introducing him, which was typewritten all open-spaced, except a notation, single-spaced and crowded into the bottom of the letter just above the signature, that he had full authority to represent N. Bank in all matters, including New York exchange, such letter, carrying notice on its face that it had been altered, was not binding on the N. Bank as a representation of its vice president's authority. (*Post, p.* 589.)

5. **BANKS AND BANKING. Officers. Authority. Estoppel.**

Although one E. dictated the policy and dominated the action of the N. Bank, in the absence of knowledge of the M. Bank of the fact, such bank could not rely on the condition, so that no estoppel could arise out of it in respect to certain dealings between the two banks. (*Post, p.* 590.)

6. **BANKS AND BANKING. Officers. Act in excess of authority. Imputation of knowledge.**

Where the vice president of the N. Bank, in treating with the M. Bank for the purchase of its stock, ostensibly for the N. Bank, but in reality for himself, was acting fraudulently and in his own interest, perpetrating a fraud on both banks, his knowledge could not be imputed to the N Bank, to bind it under the terms of the transaction as consummated by him. (*Post, pp.* 590, 591.)

Case cited and approved: Ruohs v. Bank, 94 Tenn., 57.

7. **BANKS AND BANKING. Officer. Act in excess of authority. Estoppel.**

Where the N. Bank retained one as vice president who had secured his control of it by a series of questionable transactions, it did not thereby become liable for his subsequent fraudulent

acts in purporting to represent it in purchasing the stock of the M. Bank, ostensibly for the N. Bank, but in reality for himself. (*Post, pp.* 592, 593.)

8. **BANKS AND BANKING. Deposit. Trust fund as general deposit.**

Where the N. Bank remitted $20,000 to New York to the credit of the M. Bank, the fund was not a special deposit and trust fund for the benefit of the stockholders of the M. Bank, from whom one E., vice president of the N. Bank, and purporting to act for such bank, but in reality for himself, had purchased the stock of the M. Bank, since the N. Bank had no knowledge of the purpose for which the M. Bank intended to use the money, and so did not place the fund in New York in trust for that purpose. (*Post, pp.* 593, 594.)

9. **BANKS AND BANKING. Purchase of stock in other bank. Ultra vires. Statute.**

Under Shannon's Code, secs. 2083, 2084, 2085, prescribing charter powers of discount and savings banks, the contract of such a bank, through its officers, to purchase of the stockholders of another bank their stock therein, was absolutely void, as being *ultra vires*. (*Post, pp.* 594-599.)

Acts cited and construed: Acts 1875, ch. 142; Acts 1883, ch. 168.

Cases cited and approved: Marble Co. v. Harvey, 92 Tenn., 115; Miller v. Insurance Co., 92 Tenn., 167; Clark v. Railroad, 123 Tenn., 245; Hotel Co. v. Dyer, 125 Tenn., 302; Concord N. Bank v. Hawkins, 174 U. S., 364; California N. Bank v. Kennedy, 167 U. S., 362; Central Transp. Co. v. Pullman Pa. Car, Co., 139 U. S., 24; De La Vergne Refrigerating M. Co. v. German Savings Institution, 175 U. S., 40; Anglo-American Land Mortgage Agency Co., Ltd., v. Lombard, 123 Fed., 721; Hadley v. Bankers' Trust Co., 157 Mo. App., 557.

Code cited and construed: Sec. 2083-2085 (S.); Sec. 2097 (S.).

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County.—John Allison, Chancellor.

Jas. Gallagher and L. H. Graves, for plaintiff.

H. H. Barr and W. B. Marr, for defendants.

Mr. Chief Justice Neil delivered the opinion of the Court.

The case styled in the margin is a proceeding pending in the chancery court of Davidson county to wind up the City Savings Bank as an insolvent corporation. Two receivers were appointed, and the estate is in course of settlement there. The Memphis Bank & Trust Company, also a corporation, is an intervening petitioner, seeking to have allowed as a debt against the assets certain claims as follows: One for $14,422.24, and another for $8,525, with interest. The chancellor disallowed these claims, and the petitioner has appealed and assigned errors.

The first error assigned is in the following language:

"The chancellor erred in excluding from the hearing all evidence tending to show oral statements by Moreau P. Estes in the transactions involved under the petition herein, and particularly that part of such evidence as is set out at length in the wayside bills of exception filed by both parties."

This assignment is overruled because not in compliance with Rules of the Court, section 14, subsec. 3 (160 S. W., ix), which requires that:

Wood v. Green et al.

"When the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, with citation of the record where the evidence and ruling may be found."

The other errors assigned may all be disposed of by determining, firstly, whether a certain charge of $20,000 against the Memphis bank appearing in the current account of the Nashville bank was a proper charge against the former, and secondly, whether a certificate of deposit of $8,525, held by the Memphis bank on the Nashville bank, is a valid charge against the latter.

1. As to the $20,000, this may be briefly disposed of by the statement that the money was furnished on request by the Nashville bank to the Memphis bank, by placing that sum to the credit of the latter bank in New York. The Memphis bank was duly notified that the money had been sent, and subsequently its vice president was in Nashville, saw the entry against his bank on the books of the Nashville bank, and made no objection, and none was ever made until the present petition was filed more than a year thereafter. This would amount to a settled account. No pleadings are filed justifying a reopening of the account for fraud, mistake, or surprise.

2. As to the certificate of deposit for $8,525, the evidence shows that this was issued in exchange for a draft of the same amount on New York, issued by the Memphis bank, but under instructions from Moreau

P. Estes, the vice president of the Nashville bank and president of the Memphis bank, the draft was held as a cash item, and was never collected by the Nashville bank. It was not even presented until after the failure of the Nashville bank, and then it was presented by the receiver of that bank. Payment was refused on the ground that no money was in the bank to meet it. So there was nothing on which the certificate of deposit could rest.

3. But it is insisted that the foregoing presents only the outward aspects of the testimony.

It is contended by petitioner that the two items arose in the following manner:

That the Nashville bank, through its then vice president, Moreau P. Estes, bought the majority of the stock of the Memphis bank for $28,525, and gave the latter bank drafts for the amount on New York, to be collected and used by the said Memphis bank, as a trust fund, to pay its stockholders who had sold their stock to the said Nashville bank; that for some reason, which the petition does not set forth in its statement, the drafts last mentioned were not collected; and that in lieu of these the Nashville bank placed to the credit of the Memphis bank in New York the $20,000 mentioned, and to cover the residue of the $28,525 of purchase money the Nashville bank sent to the said Memphis bank the certificate of deposit for $8,525.

The Nashville bank, through its receivers, denies that it ever purchased the stock referred to in the Memphis bank, insists that such purchase was the individual

enterprise of Moreau P. Estes, about which it knew nothing until the deal had been consummated, and that the items of $20,000 and $8,525 arose in the manner already stated in divisions numbered 1 and 2.

4. We think the evidence sustains the contention of the Nashville bank.

5. But it is urged by petitioner that, inasmuch as the deal was made by Estes, who was vice president of the Nashville bank, and he made it in the name of the latter bank, it is bound, whether he had formal authority or not. This is sought to be worked out on several theories, each of which we shall briefly consider.

Estes carried with him a letter, addressed to the Memphis bank signed by the cashier of the Nashville bank, introducing him, and bespeaking proper courtesies, such a general letter as might be given to any stranger visiting a community or persons new to him. This letter was typewritten, all open-spaced, except certain significant additional words, single-spaced, and crowded into the bottom of the letter, just above the signature, viz.:

"He has full authority to represent this bank in all matters, including signing New York exchange."

The cashier testifies that this was not in the letter when he signed it, and Estes was not introduced to contradict this evidence. We must therefore conclude that it was an interpolation, was not binding on the Nashville bank, and furnished no authority for action on the part of the Memphis bank or its stockholders. Moreover, it bore a suspicious character on its face.

It is next insisted that, although Estes was only the vice president of the Nashville bank, he dictated its policy and dominated it. Such is the evidence. Still the Memphis bank had no knowledge of this fact, and hence did not rely on it, and therefore no estoppel could arise out of it.

It is urged that, since Estes was an officer of the Nashville bank, his knowledge was its knowledge; hence the Nashville bank must be treated as present in Memphis making the deal. The principle is not applicable, because the facts show that Estes was acting in his own individual interest, and perpetrating a fraud on both banks. *Ruohs* v. *Bank,* 94 Tenn., 57, 71-72, 28 S. W., 303; 31 Cyc., 1595.

It must be remembered that there had been no previous holding out of Estes to the Memphis bank, or to the public of Memphis, as having such power, or any power other than that shown by the by-laws, and they gave him no such authority. So the Memphis bank was not misled by any false appearances, except that of the changed letter, for which, as we have already stated, the Nashville bank was not responsible.

Estes conceived the scheme of buying for himself a controlling interest in the Memphis bank. He gave no information of this to any officer of the Nashville bank. He went to Memphis, and without authority used the name of the Nashville bank in buying the controlling interest in the Memphis bank. He gave drafts on New York in the name of the Nashville bank for the purchase price, $28,525, and had

himself elected president of the Memphis bank, took a letter from Mr. Becker, then cashier of the Memphis bank, introducing him to the New York bank, reached New York by the time the drafts for $28,525 got there, saw the New York bank, told its officers that there was some mistake about these drafts (there were two of them, together making the $28,525), and as president of the Memphis bank had them returned to that bank, where in due course they were received; and subsequently turned over to Estes. All this happened in April, 1909. In May or June of the same year the Memphis bank, without explaining that it had any connection with Estes' deal, asked the Nashville bank to place $20,000 to its credit in New York. The Nashville bank did so, but at once drew on the Memphis bank for $15,000, which, with $5,000 already to the credit of the Memphis bank in the Nashville bank, made good the $20,000 sent to New York. This $20,000 so placed in New York was subsequently used by Estes, through the Memphis bank, in paying this much of the $28,525 he had agreed to pay. The rest of it, $8,525, the Memphis bank borrowed in Memphis and completed the payment. The stock was issued directly to Estes, and never to the Nashville bank. The result of this series of frauds was that Estes bought the controlling interest in the stock in the Memphis bank with that bank's own money. This fact seems not to have been appreciated by the Memphis bank until some time afterwards.

The point is made that Estes had previously defrauded the Nashville bank, and, still retaining him as one of its chief officers, that bank became responsible for the subsequent fraud he committed on the Memphis bank. The transaction referred to was that by which Estes acquired control of the Nashville bank. The evidence discloses that Estes purchased $51,000 of the $100,000 of the stock of that bank at a premium of $1.30 in the following manner: He borrowed $20,000 from a Louisville bank, giving a satisfactory form of security for the money, then, operating through a third party, paid this money to the First National Bank, the holder of the stock, and had his dummy to execute notes aggregating $45,000, secured by the shares attached as collateral. Of this sum $40,000 was paid by certificates of deposit, two of $20,000 each, which Estes caused to be issued by the Nashville bank to the Standard Trust Company, a corporation under his control. But no money was paid in to the bank to cover these certificates. Subsequently the certificates were taken up with cash he procured from the bank, for which he gave his note for $52,000, attaching as collateral his shares of stock in the bank itself, and on a subsequent renewal the note was made $53,000, and the Memphis stock was also added to the collateral. Thus in this instance, also, it is perceived that Estes procured from the bank itself most of the money to buy control of it, stewing the bank, as it were, in its own milk. The $53,000 note has never been paid, and in addition to it he executed another note to the bank for $20,000 for

"shortage." It is true the whole transaction was a fraud on the Nashville bank, and it is also true that Estes was never removed as vice president, and also true that the cashier, Baskette, who assisted him in perpetrating the fraud by issuing the bogus certificates of deposit to the Standard Trust Company, was never removed. Still we see nothing in these facts to justify us in holding the assets of this bank, so destroyed by Estes, liable for the fraud he practiced on the Memphis bank. The fact that a bank keeps a bad man in office, and, though his manipulations or chicane, in real control of its affairs, is no ground for holding such bank liable for frauds such man may personally commit for his own purposes and for his own enrichment on a bank in a distant city. The claim is a *non sequitur*. Nor can such liability attach because the bank retained in office likewise a man who assisted the leader in the perpetration of one of his frauds.

It is insisted that the $20,000 deposited by the Nashville bank in New York to the credit of the Memphis bank, was a trust fund for the benefit of the stockholders of the latter bank, from whom Estes had purchased his stock in that bank, and therefore, as we understand the argument, such fund could not be charged against the general account of the Memphis bank. The point is not well made, for the reason that the Nashville bank did not know the purpose for which the Memphis bank intended to use the money, and so did not place it in New York as a trust fund. We have already stated the reason why the Nashville bank would not be af-

fected with Estes' knowledge. The Nashville bank was applied to for the money in the usual course of business, and furnished it. It is immaterial that the Memphis bank, when it raised the money, treated it as a trust fund for its former stockholders. That was *res inter alios acta.*

But let us suppose that we are in error on all the points previously stated. It still remains that no liability can be established against the assets in question, because it was not within the power of the Nashville bank, under its charter, to purchase the controlling interest in another bank. *Marble Co.* v. *Harvey,* 92 Tenn., 115, 20 S. W., 427, 18 L. R. A., 252, 36 Am. St. Rep., 71; *Miller* v. *Insurance Co.,* 92 Tenn., 167, 175, *et seq.,* 21 S. W., 39, 20 L. R. A., 765; *Clarke* v. *Railroad,* 123 Tenn., 245, 130 S. W., 751; *Hotel Co.* v. *Dyer,* 125 Tenn., 302, 306, 142 S. W., 1117; *Concord N. Bank* v. *Hawkins,* 174 U. S., 364, 19 Sup. Ct., 739, 43 L. Ed., 1007; *California N. Bank* v. *Kennedy,* 167 U. S., 362, 367, 17 Sup. Ct., 831, 42 L. Ed., 198; *Central Transp. Co.* v. *Pullman Pa. Car Co.,* 139 U. S., 24, 11 Sup. Ct., 478, 35 L. Ed., 55; *De La Vergne Refrigerating M. Co.* v. *German Savings Institution,* 175 U. S., 40, 20 Sup. Ct., 20, 44 L. Ed., 65; *Anglo-American Land Mortgage Agency Co., Ltd.,* v. *Lombard,* 132 Fed., 721, 736, *et seq.,* 68 C. C. A., 89.

The rule is that in the absence of statutory power corporations cannot buy stock in other corporations. As to savings banks, power under the charter was given to

invest in public stocks.  Shannon's Code, sections 2083
2085; Acts of 1875, ch. 142.

Public stocks are those of the State or Nation, and
not those of a private corporation such as the Mem-
phis bank.  The distinction and the reasons therefor
are clearly shown in section 4038, 4 Thompson's Corpo-
rations, as follows:

"The general rule allows the investment of trust
funds in the government securities, but not in the stock
of private corporations, unless the creator of the trust
expressly directed the investment in such securities.

"The policy which allows the investment in securi-
ties originated largely in the necessity of the govern-
ment and in the public advantage of creating a market
and demand for government securities.  On this sub-
ject it has been said by an eminent writer that:

" 'It may be admitted that great public emergencies
and national dangers have an unfavorable effect upon
the value of public securities; but such emergencies
and dangers have the same effect upon the stocks of
private corporations.  In addition to these depressing
influences, the capital of such companies runs the risks
and chances of trade, business, and speculation.  Cal-
lamities that depress public credit seldom occur, while
the risks of trade are constant.  It seems to be the
wiser course to withdraw the funds settled for the
support of women, children, and other parties who
cannot exercise an active discretion in the protection
of the interests, as much as possible from the chances
of business.  It may be said that the settlors may al-

ways do this by directing in what manner the funds settled by them shall be invested, but it would seem to be wiser for the court to establish the safest rule in the absence of special directions, and leave it to the settlor, if he prefers, to direct a less safe investment.' ''

By Acts 1883, ch. 168 (Shannon's Code, section 2097), the charter act was amended so as to read:

Giving the power ''to discount promissory notes, bills of exchange, or other evidences of debt, buy and sell the same, deal in gold, silver, bullion, bonds, stocks, or other securities generally, advance money upon a pledge or mortgage of real or personal estate, and sell the same, and have and possess all other rights which appertain and belong to a banking institution, except the power to issue notes for the purposes of currency, which power is hereby withheld.''

This court has not previously passed upon the power to deal in stocks under the amendment of 1883, but a similar question has been passed upon in *Hadley* v. *Bankers' Trust Co.,* 157 Mo. App., 557, 138 S. W., 669-672. It was there held that one bank had no right to buy the controlling interest in another bank, the reason being that such control of one corporation by another would tend to monopoly; the same reason that was given in *Mable* v. *Harvey,* supra.

There is nothing in the case of *Clark* v. *Railroad,* supra, which opposes this view. That case must be understood in the light of the facts stated in the opinion. The court was dealing, not with a corporation in like business, but with an investment company. That

case would not apply to a corporation in the same or like business buying a controlling interest in another corporation. Such practice would tend directly to monopoly in the way of gathering special kinds of business into a few hands.

Such a purchase would be absolutely void, and it would be immaterial that benefits had been received. Such benefits would not prevent a declaration of invalidity. Of course, an action might be maintained to recover the value of the benefits conferred; but the present case does not involve that question. We think that the following from *Central Transportation Co.* v. *Pullman Car Co.,* supra, states the true doctrine:

"A contract of a corporation, which is *ultra vires,* in the proper sense—that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature—is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. When a corporation is acting within the general scope of the powers conferred upon it by the legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisite to its existence or to

its action, because such requisites might in fact have been complied with. But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation, nor the other party to the contract, can be estopped, by assenting to it or by acting upon it, to show that it was prohibited by those laws.''

But it does not appear in this case that the Nashville bank was benefited by the transaction. It is true that after Estes had borrowed $52,000 on the bank's own stock, and had renewed the note, he added the Memphis stock as collateral. It is furthermore true that this stock was put up with the Louisville bank as collateral on a debt which the Nashville bank owed to such Louisville bank, and later this stock was taken down by the receivers on settlement with the Louisville bank by the payment of $8,000 in cash. The fact that Estes used this Memphis stock as collateral for money previously borrowed by him could not be treated as the obtention of a benefit in the sense in which that word is understood in transactions of an *ultra vires* character.

There yet remains one other question. There was a note of $7,500 known in the record as the Wheeler note, on which the petitioners, Smith and McTigue, were sureties, or rather indorsers. It was a part of the consideration of the stock purchase that this note should be assumed by the purchaser, and Smith and McTigue thus relieved. This contract was not complied with, and therefore Smith and McTigue have filed their petition claiming the $7,500 as a liability against

the Nashville bank. The receivers deny that any liability exists. All of the defenses previously stated as applying to the liability asserted in the petition of the Memphis bank apply equally to this claim. As already stated, the Nashville bank was not the purchaser, but Estes in his individual capacity. The same point is made in favor of this demand as was made by the Memphis bank, based on the fact that the Nashville bank retained in its employment a bad man as its vice president, the said Estes, and also Baskette, after that bank knew that frauds on it had been committed by these two men. It is unnecessary to repeat the answer already given.

No recovery can be allowed against the assets in the hands of the receivers, either to the Memphis bank or to Smith and McTigue.

There is no error in the decree of the chancellor, and it must be affirmed, with costs.

MR. JUSTICE GREEN being disqualified because of interest, did not sit in this case or take part in the decision of it.